EVELYN ZOE WEUM, EXECUTRIX, SUBSTITUTED FOR THURSTON W. WEUM, DECEASED, v. MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION, OMAHA.
SAME v. UNITED BENEFIT LIFE INSURANCE COMPANY, OMAHA.[1]

May 29, 1952.

No. 35,621.

[1]Reported in 54 N. W. (2d) 20.

*Mahoney, Morrison & Cragg* and *Harry H. Peterson,* for appellants.

*John M. Palmer, James L. Hetland, Jr.,* and *Stinchfield, Mackall, Crounse & Moore,* for respondent.

MAGNEY, JUSTICE.

Thurston W. Weum, who as plaintiff instituted these actions, died following the appeal to this court, and Evelyn Zoe Weum as executrix of his estate has been substituted as respondent in his stead. Decedent will be referred to hereinafter as plaintiff in this. opinion.

Plaintiff was born on May 7, 1882. In 1909, he was licensed as a physician by the state of Minnesota. After eight years of general practice, he returned to medical school for a year of postgraduate

work in obstetrics and gynecology, and thereafter engaged in no other field of practice. Obstetrics has to do with the delivery of babies and the necessary prenatal and postnatal care of the mother. Gynecology deals with the surgical and medical treatment of diseases of women.

On June 11, 1937, defendant Mutual Benefit Health & Accident Association, Omaha, hereinafter referred to as Mutual, issued to plaintiff a health and accident policy. In his application for insurance, plaintiff stated the nature of his business and occupation to be that of "Physician and Surgeon." To the question: "What are all of your duties connected therewith?" he answered: "Obstetrics and Gynecology." The policy in its listing of accident indemnities provides:

> "(1) MONTHLY INDEMNITY AT THE RATE OF TWO HUNDRED ($200.00) DOLLARS. *For such injuries that wholly and continuously disable the Insured so long as the Insured lives and total loss of time continues,* * * * ." (Italics supplied.)

On the outside cover of the policy there is printed in large letters:

"THIS POLICY PROVIDES
BENEFITS FOR LOSS OF
LIFE, LIMB, SIGHT OR TIME,
BY ACCIDENTAL MEANS,
OR LOSS OF TIME BY
SICKNESS AS HEREIN
PROVIDED"

On the first page of the policy at the very top, in large letters, there is printed:

"BUSINESS AND PROFESSIONAL MEN'S NON-CANCELLABLE POLICY
"THIS POLICY PROVIDES BENEFITS
FOR LOSS OF LIFE, LIMB, SIGHT
OR TIME, BY ACCIDENTAL MEANS,
OR LOSS OF TIME BY SICKNESS AS
HEREIN PROVIDED"

Paragraph 1 of the "Standard Provisions" of the policy reads:

"* * * No reduction shall be made in any indemnity herein provided by reason of change in the occupation of the Insured or by reason of his doing any act or thing pertaining to any other occupation."

Paragraph 12 of the "Standard Provisions" reads:

"If the Insured shall at any time change his occupation to one classified by the Association as less hazardous than that stated in the policy, the Association, upon written request of the Insured, and surrender of the policy, will cancel the same and will return to the Insured the unearned premium."

On June 19, 1944, defendant United Benefit Life Insurance Company, Omaha, hereinafter referred to as United, issued to plaintiff two health and accident policies. In each application plaintiff stated that the nature of his business and occupation was that of "Physician and Surgeon." In answer to the question in each application: "What are all of your duties connected therewith?" he answered: "Obst. and Gyn. Specialty." Along the left-hand edge of each application this notation in longhand is found: "Minnesota State Medical Ass'n—6th Dist.—Mpls." Diagonally across the face of one of the applications is printed in large letters: "SPECIAL POLICY FOR YOUR MEDICAL GROUP." Aside from this item, the two policies are identical. Attached to each policy is a rider which is captioned: "SPECIAL RIDER FOR Eligible Members of Minnesota State Medical Society, Sixth District." A provision of the rider reads:

"It is further agreed that the Company reserves the right to decline to renew this policy on the following grounds only:

"A. Nonpayment of premiums on or before their due dates.

"B. If the Insured leaves the practice of Medicine.

"C. If all renewals are declined on all such policies issued to members of the above-named Society."

The cover of the policies has this notation in large letters:

"THIS POLICY PROVIDES BENEFITS
FOR LOSS OF LIFE, LIMB, SIGHT
OR TIME, BY ACCIDENTAL MEANS,
OR LOSS OF TIME BY SICKNESS
AS HEREIN LIMITED AND PROVIDED."

At the top of the first page of each policy, in large letters, we find printed:

"SPECIAL INCOME PROTECTION POLICY
"THIS POLICY PROVIDES BENEFITS FOR LOSS OF
LIFE, LIMB, SIGHT OR TIME, BY ACCI-
DENTAL MEANS, OR LOSS OF TIME
BY SICKNESS AS HEREIN LIMITED
AND PROVIDED."

Part E of each policy reads:

"If such injuries, as described in the Insuring Clause, do not result in any of the above mentioned specific losses but *shall wholly and continuously disable the Insured for one day or more, the Company will pay a monthly indemnity at the rate of the Regular Monthly Benefit so long as the Insured lives and suffers said total loss of time.*" (Italics supplied.)

Part of Section 1 of the Standard Provisions of the policies is worded:

"* * * No reduction shall be made in any indemnity herein provided by reason of change in the occupation of the Insured or by reason of his doing any act or thing pertaining to any other occupation."

Section 12 reads:

"If the Insured shall at any time change his occupation to one classified by the Company as less hazardous than that stated in the policy, the Company upon written request of the Insured, and

surrender of the policy, will cancel the same and will return to the Insured the unearned premium."

On March 30, 1947, plaintiff suffered an accidental injury. For some time he was paid total accident disability benefits. He claimed that the nature of the results of his injuries was such that he was entitled to total disability benefits for life under the terms of all three policies, and he brought these actions to recover such additional benefits. Defendants denied that under the terms of the policies the physical condition of plaintiff, as a result of the accidental injury, was such that he was entitled to total disability benefit payments for life, and refused to make such additional payments.

At the trial the court submitted to the jury, in the form of special verdicts, two questions. The first one reads:

"Was Thurston W. Weum, the plaintiff, wholly and continuously disabled and did he suffer total loss of time on and after February 18th, 1948?"

The jury answered in the affirmative. The second question was:

"If your answer to Special Interrogatory No. One is in the affirmative, then how long was the plaintiff wholly and continuously disabled and suffered total loss of time after February 18th, 1948?"

The jury answered: "To the present time." The court made findings of fact on all the other issues involved and incorporated into the findings the answers of the jury to the special interrogatories. The court allowed full recovery.

Each defendant appeals from the order of the court denying its motion for amended findings of fact and conclusions or, in the alternative, for a new trial.

The injury which plaintiff suffered left him with permanent impairment. He sustained a rupture of the biceps tendon of his right arm and an acute sprain of the acromic clavicular joint (joining collarbone to shoulder) as the result of an accident in his home while lifting a heavy piece of furniture in the process of laying

a rug. On April 7, 1947, plaintiff underwent an operation on his arm. A large clot was removed, and the biceps tendon which had been pulled loose from its fastening at the elbow was sutured to the tracia, another muscle in the upper arm. After ten days in the hospital he was discharged. He continued to suffer considerable pain and consulted a doctor almost every other week until February 1948. During this time heat treatments, massage, and instruction in muscle re-education were given. During the summer of 1947 there was gradual improvement, but attacks of severe pain of three to ten days' duration occurred every two weeks. There was constant cramping of the muscle in the arms and pain similar to that felt when one strikes his crazy bone. On January 3, 1948, a "nerve block" by infiltration of novocain and quinine neuria hydrochloride was performed in an attempt to cut off the pain in the arm. The injection was repeated about a week later. Plaintiff continued to feel dull pain in his arm and was hampered by cramps when the arm was used.

An examination of plaintiff just prior to the trial indicated a continued weakness in the right arm when tested against resistance. The biceps muscle was flabby, and there was a depression in the arm just above the elbow. There was 50 percent loss of power in the biceps. Grasp in the right hand was 30 pounds, while in the left hand, roughly normal, the plaintiff could exert 60 pounds. Grasping power of the right hand was about one-third of what it should have been. There was an estimated 50 percent loss of ability in the pulling back motion of the arm, and plaintiff experienced difficulty and pain in supination and pronation of the hand (the turning from palm-up to palm-down functions of the biceps muscle), especially when his arm was extended. He was unable to turn his arm over in front of him. The medical witnesses were of the opinion that this inability and weakness were permanent. Dr. Myron O. Henry estimated a probable 15 percent loss of use of all functions of the right arm and hand. In the practice of obstetrics, there are certain techniques and functions which require the obstetrician to rotate his hand from the position of supination to

that of pronation. Since he was unable to make these movements, he was unable to perform the work required of an obstetrician. Also, in a large number of obstetrical cases forceps must be used. It is necessary to grasp the forceps and to turn the hand over from a position of pronation to supination or from supination to pronation. This plaintiff was unable to do. Also, in connection with the delivery of babies, a physician must in the great majority of cases perform an episiotomy. This plaintiff was unable to do because he experienced a cramp when he had to clamp down on his needle forceps. He could not use any instruments requiring a grip. In operations, after his return to work, plaintiff would make the incision and the exploration, and then Dr. Alvin J. Meyer, his associate, would take over. Plaintiff would help hold the retractor and did other work requiring the use of his left hand. He had difficulty in taking blood pressure because of lack of strength to squeeze the bulb, and had to depend upon his nurse to do it. She also had to help him raise patients on the examination table. Whenever he attempted to lift anything he had pain in the right arm.

There can be no question on the record that plaintiff was totally disabled from performing any work until he returned to his office on February 18, 1948. At that time, he saw from two to ten patients daily. After his return to the office he did not attempt to conduct any operations alone and unaided.

Shortly after the accident, plaintiff became associated with Dr. Meyer, a physician and surgeon also specializing in obstetrics and gynecology, with offices in another part of the city. Plaintiff continued to pay all expenses of the office and paid Dr. Meyer $50 for all deliveries of babies; $100 for Caesarean deliveries; 50 percent of the fee for operations when the fee was less than $200; and 50 percent of the fee for all treatments. Dr. Meyer's name was placed on the office door. He could see his own patients at plaintiff's office and bill them separately. Up to February 18, 1948, Dr. Meyer spent part of four days a week in plaintiff's office, taking care of plaintiff's patients with the assistance of plaintiff's nurse.

After plaintiff's return to his office, Dr. Meyer went to the office Tuesday and Friday mornings and at other times, if necessary.

In 1947, there were 25 deliveries by Dr. Meyer and two Caesareans. In 1948, there were 30 deliveries by Dr. Meyer and one Caesarean. In 1949, there were 23 deliveries by Dr. Meyer and four Caesareans at which plaintiff was present. In 1950, there were 28 deliveries by Dr. Meyer and none by plaintiff, and two Caesareans where plaintiff was present. On three occasions in 1949, plaintiff attempted to perform deliveries but was unable to complete the work. In 1947, Dr. Meyer performed nine operations, but plaintiff was not present at any of them. In 1948, there were seven operations by Dr. Meyer alone and nine where plaintiff was present. In 1949, there was one operation that Dr. Meyer performed alone and six in which plaintiff helped. In 1950, there were three operations which Dr. Meyer performed alone and six in which plaintiff helped. When plaintiff was present, he did supervisory work and helped with the operation, such as holding the retractor. Any arrangement between plaintiff and Dr. Meyer could be terminated at any time. In 1946, plaintiff alone did 48 deliveries, four Caesareans, and 29 operations, or a total of 81.

In connection with his obstetrical work, plaintiff would on the average make 12 to 14 examinations before confinement and two *post partum* examinations. After plaintiff's return to the office in 1948, he was able to handle the prenatal care of his patients with the assistance of his nurse. Dr. Meyer testified that in 1948 plaintiff made examinations, including pelvic and rectal, prescribed treatment for patients, and supervised certain injections given by the office nurse. These examinations and prescriptions were in accordance with previous arrangements made by the patients. Dr. Meyer was asked: "What do you think would happen to Dr. Weum, if you terminated that relationship?" He answered: "Well, he would have to quit."

Plaintiff's net income from his medical practice dropped considerably during the year of his absence from the office and con-

tinued to drop after his return. The facts may be summarized as follows:

| | 1946 | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|---|
| Patients examined | 4,355 | 2,738 | 2,865 | 2,841 | 2,562 |
| Obstetric & Gynecology cases | 81 | 60 | 47 | 34 | 39 |
| Net Income | $13,135.70 | $8,258.80 | $6,315.25 | $9,004.04 | $6,847.23 |

The question here presented concerns the liability of defendants to pay indemnity from February 18, 1948, to the time of the trial, February 15, 1951. The disposition of this appeal turns upon the propriety of the instruction to the jury as to the meaning of the terms of the policies which we have already quoted and upon which the actions are based.

In its charge to the jury the court said:

"I charge you that the phrase 'wholly and continuously disabled so long as the insured lives and total loss of time continues' does not mean that the plaintiff was required to be utterly helpless or absolutely dependent in order to sustain a recovery in this action. It is enough that he be unable to perform the substantial and material acts necessary to the successful prosecution of his occupation or employment in the customary and usual way."

The court also stated:

"I charge you that the term 'total loss of time' refers to the loss of business time connected with plaintiff's occupation of physician and surgeon specializing in obstetrics and gynecology."

Exception was taken by defendants to these instructions. They now assert that it was error to give the instructions and to refuse to give their requested instruction No. 3, as follows:

"A person is not totally disabled within the meaning of the defendants' policies if he is able to earn money in any calling or vocation for which he was fitted by education, training and experience at the time the defendants' policies were issued to him."

They also assert that the evidence does not support the finding of the jury, adopted by the court as a finding of fact, that plaintiff was wholly and continuously disabled from February 18, 1948, until the time of trial. Defendants state the question on appeal as being—

"whether the health and accident policies in question provided for indemnity where a total disability existed simply with respect to the specific occupation of the assured or whether it was necessary that the total disability cover both the specific occupation and any similar occupation for which the assured was fitted."

In determining the rights between the parties, the contracts of course must govern. All three of the policies here involved insure "against *loss of* life, limb, sight or *time*." (Italics supplied.) The Mutual policy, Part D, provides:

"If such injuries * * * do not result in any of the above mentioned Specific Losses, but shall result in *loss of time, the Association will pay,* * * *

"MONTHLY INDEMNITY * * * *For* such *injuries that wholly and continuously disable the Insured so long as the Insured lives and total loss of time continues,* * * *."* (Italics supplied.)

The United policies, Part E, provide:

"*If such injuries,* * * * do not result in any of the above mentioned specific losses but *shall wholly and continuously disable the Insured for one day or more, the Company will pay* a monthly indemnity * * * *so long as the Insured lives and suffers said total loss of time.*" (Italics supplied.)

While coverage of an insurance policy depends upon the language used in the particular contract, the risk coverage of health and accident policies has been differentiated into two general classes—the "general disability" policy, which insures against disability of the insured to engage in any occupation for which he is suited; and the "occupational disability" policy, which insures against disability to engage in the insured's specific usual occupation. Hetzel v. Pacific Mut. L. Ins. Co. 108 W. Va. 22, 150 S. E. 385; Erreca v. Western

States L. Ins. Co. 19 Cal. (2d) 388, 121 P. (2d) 689, 141 A. L. R. 68; Sibley v. Travelers' Ins. Co. 275 Ill. App. 323. In Jacobson v. Mutual Benefit H. & A. Assn. 70 N. D. 566, 578, 296 N. W. 545, 552-553, the court pointed out the difference between the "occupational" type of policy and the "general" type. The two types of policies are present in the same case and the coverage distinguished in Garms v. Travelers Ins. Co. 242 App. Div. 230, 273 N. Y. S. 39, and Muzio v. Metropolitan L. Ins. Co. 249 App. Div. 177, 291 N. Y. S. 955. The classification has never been specifically made by this court, but examples have been presented in several cases. Cf. Lobdill v. Laboring Men's Mut. Aid Assn. 69 Minn. 14, 71 N. W. 696, 38 L.R.A. 537, with Lorentz v. Aetna L. Ins. Co. 197 Minn. 205, 266 N. W. 699.

In prior Minnesota cases, the "loss of time" resulting from "total disability" or where insured was "wholly disabled" was specifically defined in the policies themselves. Thus, in the Lobdill case, the policy specifically insured the plaintiff as a merchant by occupation (69 Minn. 15, 71 N. W. 696) "against loss of time * * * *wholly and continuously disabling said member from transacting any and every kind of business pertaining to the occupation above stated,*" which is language commonly used in the occupational type of policy. This court held that the policy insured against occupational disability. But in Monahan v. Supreme Lodge, 88 Minn. 224, 92 N. W. 972; Carson v. New York L. Ins. Co. 162 Minn. 458, 203 N. W. 209; Wilson v. Metropolitan L. Ins. Co. 187 Minn. 462, 245 N. W. 826; and Lorentz v. Aetna L. Ins. Co. 197 Minn. 205, 206, 266 N. W. 699, 700, where the policy terms were "totally disabled and * * * unable to engage in any occupation or employment for wage or profit" or remuneration, or words of similar import, this court held that the policies insured against disability to engage in any occupation for which, considering training, education, age, and former occupation, the insured might be fitted. In Koeberl v. Equitable L. Assur. Society, 190 Minn. 477, 478, 252 N. W. 419, the policy terms provided that "Disability is total when it prevents the insured from engaging in any occupation or performing any work for compensation of financial value." The same terms were used in Fine v.

Equitable L. Assur. Society, 200 Minn. 301, 274 N. W. 163. It is apparent that little help may be had from any of the above cases, since under the policies in question the insurers agree to pay indemnity for total loss "of time" if the insured's injuries are such that they wholly and continuously disable him.

In Preveden v. Metropolitan L. Ins. Co. 206 Minn. 393, 394, 289 N. W. 46, 47, we held that total disability "from engaging in any occupation and performing any work for compensation or profit" means disability to substantially perform the essential duties of any occupation. The law of Illinois was applicable in that case, since it was an Illinois contract. However, the rule there stated is in accord with Minnesota decisions upon similar policy terms.

Berset v. New York L. Ins. Co. 175 Minn. 210, 220 N. W. 561, and Maze v. Equitable L. Ins. Co. 188 Minn. 139, 246 N. W. 737, involved other terms of policies similar to those cited above and are of no assistance here.

Defendants contend that the terms of the policies insuring against injuries which "wholly and continuously disable" the insured and which cause "total loss of time" are not ambiguous in themselves; that "total loss of time" should not be limited so as to mean total loss of time *in the business or occupation or profession of the insured;* and that where the terms of the policy do not specifically limit the meaning of the loss the court cannot insert such limitation.

Plaintiff claimed that the words "loss of time" as used in the policies meant loss of business time from the occupation stated in the application for insurance; that the policies, when considered as a whole, showed that insurers and insured intended "occupational disability" insurance; and that to limit the coverage would mean a forfeiture of rights which the insured supposed he acquired. It is asserted that defendants would have the court interpolate the words "from engaging in any occupation for wage or profit" into the insurance contract so as to modify the words "wholly and continuously disable." Plaintiff would have the court interpolate the

words "from engaging in the occupation stated in the application" into the same contracts so as to modify the same wording.

The meaning of terms similar to those in the policies here involved has been considered in other jurisdictions. In Mutual Benefit H. & A. Assn. v. Bain, 242 Ala. 471-473, 6 So. (2d) 599-601, the court disapproved an instruction to the jury that an injury which "wholly and continuously disabled" the insured was one which prevented him from performing "the material acts of insured's business or occupation in substantially his customary and usual manner." The court stated that "When a policy does not limit the disability to the business in which insured was engaged, we cannot do so," and held that the coverage was not limited to insured's customary business. But cf. Metropolitan L. Ins. Co. v. Blue, 222 Ala. 665, 133 So. 707, 79 A. L. R. 852, where the court said that inability to do "any work or occupation" meant inability to do substantial and profitable work in the insured's profession. However, the court there was not called upon to decide whether the policy was "occupational" or "general," since it found that the insured plaintiff doctor could do substantially all the material duties of his occupation.

In Jacobson v. Mutual Benefit H. & A. Assn. 70 N. D. 566, 578, 296 N. W. 545, 553, a dictum supporting the holding of the Bain case reads:

"If the policy is of the 'general' type and undertakes to insure against loss only in case the insured shall become 'wholly disabled' or 'totally disabled,' and there are no words limiting the disability to a particular business or occupation, the insured becomes 'wholly' or 'totally' disabled, within the meaning of the policy, if the infirmity occasioned by the accident in fact renders the insured unable to carry on any business, or remunerative vocation, which business or vocation the insured would be qualified, physically and mentally, to carry on if it were not for such infirmity."

In Zips v. Mutual Benefit H. & A. Assn. (Mo. App.) 169 S. W. (2d) 62, the policy terms were the same as in the Jacobson case, and there is similar dictum concerning the meaning of the words.

In Hodgson v. Mutual Benefit H. & A. Assn. 153 Kan. 511, 112 P. (2d) 121, the policy terms were almost identical with those here involved. The facts stated in the opinion showed that the insured was totally disabled from carrying on his former occupation as a construction worker, but that he had attempted to engage in other occupations. The court did not discuss whether the policy insured against occupational or general disability, but, by inference, treated the policy as one of general disability insurance.

The opinion of the court in Mutual Benefit H. & A. Assn. v. Bird, 185 Ark. 445, 47 S. W. (2d) 812, is similarly vague in discussion of similar policy terms. It is not clear whether the court attempted to distinguish "general" and "occupational" disability insurance. An inference may be drawn that it treated the policy as giving occupational disability coverage. See, also, Wade v. Mutual Benefit H. & A. Assn. 115 W. Va. 694, 177 S. E. 611; Mutual Benefit H. & A. Assn. v. Milder, 152 Neb. 519, 41 N. W. (2d) 780; Mutual Benefit H. & A. Assn. v. Francis (8 Cir.) 148 F. (2d) 590.

In Besh v. Mutual Benefit H. & A. Assn. 304 Mich. 343, 8 N. W. (2d) 91, the defendant argued that, though the insured could not engage in his former occupation, policy terms the same as those in issue in this case did not provide indemnity, since the insured could do other work. The court stated that the terms of the policy were not ambiguous; that plaintiff must show that he was (304 Mich. 353, 8 N. W. [2d] 94) " 'wholly and continuously' disabled"; but the meaning of those terms was not defined. The court held that the evidence sustained the finding of the trial court that insured was wholly and continuously disabled. The court relied upon and quoted from cases dealing with policies which are clearly "occupational disability" policies. In holding that the terms of the policy were not ambiguous, the Michigan court was apparently of the opinion that "loss of time" clearly meant loss of time in the insured's business.

In Mutual Benefit H. & A. Assn. v. Mathis, 169 Miss. 187, 190, 142 So. 494, 495, the term "total disability and total loss of time" was

construed as meaning total disability and loss of time in the insured's business.

In Mutual Benefit H. & A. Assn. v. Murphy, 209 Ark. 945, 955, 193 S. W. (2d) 305, 310, the court approved an instruction defining total disability and total loss of time as that disability which "renders him [the insured] unable to perform all the substantial and material acts of his business or the execution of these acts in the usual and customary way."

The terms of the policies here are not so clear that they may be applied without judicial construction and interpretation of their meaning. The insurers must concede that the terms cannot be given their literal meaning of complete helplessness. Some limitation upon the literal terms is obviously necessary in order to give a realistic meaning to the words and give to the insured some measure of the protection which he bargained and paid for. This court has not hesitated to supply such a limitation of the literal meaning. Lobdill v. Laboring Men's Mut. Aid Assn. 69 Minn. 14, 71 N. W. 696, 38 L. R. A. 537, held that the doing of trivial or occasional acts did not prevent a finding of total disability. "Any occupation whatever" has been interpreted to mean any occupation similar to that in which the insured has been ordinarily engaged, or for which his training, education, and physical condition permit him to be fitted within a reasonable time. Carson v. New York L. Ins. Co. 162 Minn. 458, 460, 203 N. W. 209, 210.

Where clarification of the literal meaning of the terms of the contract is necessary but the nature of the limitation is not stated in apt words in the policy, this court, when presented with a question of the extent of coverage, must decide what the intention of the parties is as to the extent of the limitation of the literal meaning of the words. The literal meaning of the policy terms must be limited to some extent. The extent of the limitation does not appear in the policy. Different interpretations of the word are reasonably possible. We then have a contract which is ambiguous.

Where one of the parties draws a contract and the other must accept or reject but cannot vary the terms, the burden is upon the

party drawing the contract to make the meaning plain. Where meaning is thus uncertain, as it is in the contracts here involved, the ambiguities and doubts must be resolved against the party who prepared the contract. Zeitler v. National Cas. Co. 124 Minn. 478, 145 N. W. 395. In resolving doubts as to the meaning to be given the terms of an insurance contract, this court will note the purposes for seeking insurance and will avoid an interpretation which would forfeit rights which the insured may have believed he was securing, but which, because of the failure of the insurer to use clear language, are now cast in doubt. Cf. Patterson v. Adan, 119 Minn. 308, 312, 138 N. W. 281, 283, 48 L.R.A.(N.S.) 184. The general rule is that a policy of insurance is to be construed liberally in favor of the insured and every reasonable doubt as to the meaning of the language used resolved in his favor. This rule applies in full force to accident and health policies. 3 Dunnell, Dig. & Supp. § 4872.

Defendants rely upon Mutual Benefit H. & A. Assn. v. Bain, 242 Ala. 471, 473, 6 So. (2d) 599, 601, *supra*. That case defines the terms "wholly disabled" and "total loss of time." The court held that "when a policy does not limit the disability to the business in which the insured was engaged, we cannot do so." The court did not seem to recognize that it was in any event limiting the literal meaning of the words "wholly disabled." Defendants in the instant case say they "are unable to determine on what rational basis the court could choose to construe these policies as occupational policies instead of general disability policies by the bare fact of silence." They say (Appellants' brief, p. 27):

"* * * We are unable to perceive any realistic basis for favoring the construction of these policies as occupational policies over their construction as general disability policies where no words of restriction to specific occupation was used."

They realize that the wording of the policies leaves a void and that some construction by the court must be given. They would concede that this court must limit the words of the policies and discover the meaning which is not apparent. They say that where the dis-

ability clause itself does not refer to a specific occupation the policy must be construed as a "general disability" policy. This is the view of the Bain case, *supra*. Reference to the specific occupation of the insured in the coverage clause would make the nature of the policy clear. The absence of the specific coverage term is not indicative. The occupation of the insured is set out in the applications, which are made part of the policies.

Since the policies fail to state whether "loss of time," which means loss of earnings, must be incurred in insured's specific occupation or in some other occupation, the court must read something into the policies. There is silence or a void in defining the coverage. What does "loss of time" refer to? While in the Bain case the court said that where the policy does not limit the liability to the business in which insured was engaged the court cannot do so, the court in fact did read something into the policy to the effect that the insurer would indemnify insured only for loss of time if he was totally disabled and unable to engage in any occupation or employment for wage or profit or remuneration, or words of similar import, and denied recovery because insured had not suffered loss of time within the meaning of the words which the court read into the contract. All these policies said was "loss of time." A layman reading the policy would naturally conclude that "loss of time," with nothing more said, means loss of business time in the occupation of the insured. The circumstances of the issuance of the policies, with their stamped and written notations, although the policies say nothing as to loss of time from the insured's particular occupation, surround them with an air of occupational coverage. In our opinion, the contracts here are clearly ambiguous and should not be construed restrictively. It would seem that this is the sort of case where the well-settled rule of construction against the insurer should be applied.

Defendants also say that the provisions against reduction of indemnity in the event that insured changed to a more hazardous occupation indicate that change of occupation was to have no effect, and that therefore it appears that the parties intended to insure

against general disability. In our opinion, the term is not indicative of the intent of the parties upon the issue here raised. The object of insured in seeking insurance may be to secure a certain level of income protection while he is at an age and in such physical condition that he may secure such insurance. If indemnity may be reduced upon a change of occupation, he might be disappointed if he tried to secure additional insurance.

Consideration of the terms of the contracts gives but mild support to the contention of plaintiff that the policies were intended to insure against disability in insured's occupation. The statement of occupation and duties in the application is of no significance, since it appears that the application forms used are general forms used for application of all policies.

The United policy applications are stamped to indicate that the policy was issued under a group plan for the medical association. A rider provides that the policies will be renewed as long as insured continues in the medical profession if the group plan is continued. The mere fact that a policy is one of a group policy does not necessarily make the policy an "occupational" policy. The policy involved in the Lorentz case, 197 Minn. 205, 266 N. W. 699, *supra,* was a group policy, but gave only general disability insurance.

The record is clear that plaintiff here was so physically handicapped as a result of his injury that he would have been unable to perform the most important part of his specialty as an obstetrician, namely, the delivery of babies. He would have had to employ some other specialist to do the work for him. It is fair to assume that no expectant mother would have engaged him to give her prenatal care only. And postnatal care follows delivery. If plaintiff had attempted to continue to practice his specialty as an obstetrician without employing someone to do the actual work of delivery, his practice along that line would have disappeared. There would have been neither prenatal care nor *post partum.* Since he was unable to perform operations, his practice as a gynecologist would also have disappeared, unless he could have employed someone to do

the most substantial and material part of that specialty. We have detailed his income from 1946 to 1950, inclusive. In 1946, the year preceding plaintiff's accident, his earnings amounted to $13,135.70. After that it dropped steadily to $6,847.23 in 1950. An annual income of over $6,000 is substantial, and if the amount of money received were the sole criterion it would negative the existence of total disability in plaintiff's specialized occupation. Total disability in an occupation is to be measured by the absence of individual earning capacity rather than by the absence of income. In the light of the evidence, the issue of total disability was a question of fact for the jury. Upon this evidence, the jury could reasonably find that plaintiff's income for the years 1947, 1948, 1949, and 1950 was primarily the product of his past professional good will and standing, plus the hired specialized professional services of Dr. Meyer, and not the result of any current earning capacity. The gradual decrease of his income from year to year corroborates this analysis. By being present in his office, plaintiff was able to cash in on his accumulated good will and reputation as a specialist in obstetrics and gynecology, and his resulting income could not therefore be attributable to any existing professional earning capacity. As was stated by Mr. Justice Mitchell in Lobdill v. Laboring Men's Mut. Aid Assn. 69 Minn. 14, 16, 71 N. W. 696, 38 L. R. A. 537:

"Total disability must, from the necessity of the case, be a relative matter, and must depend largely upon the occupation and employment in which the party insured is engaged."

In Lorentz v. Aetna L. Ins. Co. 197 Minn. 205, 207, 266 N. W. 699, 700, a general disability policy was involved. Plaintiff, a railway employe, testified that he was unable to do the work of a railroad employe. He was injured twice. Before he was injured the second time, he was interested with others in a petroleum business. He hired men to run the business. In its instructions to the jury the court said:

"* * * In determining whether the plaintiff is disabled within the meaning of the policy as I have given it to you, you should take

into consideration the plaintiff's occupation at the time he was injured, his training in life, his schooling, his present physical condition, his age and all other facts presented by the evidence bearing upon what work he might fit himself for within a reasonable time."

Medical men testified that in their opinion plaintiff was unable to earn wages as a railroad employe or as a laborer in any other employment. Defendant contended that the evidence was conclusive that plaintiff was able to carry on an occupation for profit; that he carried on a petroleum products distribution business at Staples and filling stations there and at two other points; that he negotiated leases, occasionally filled tanks; that he could walk short distances, had driven a car 140 miles, had solicited business for his distribution plant at Wadena, had gone on hunting and fishing trips, had attended dances, and at one time had engaged in a personal altercation. His business at Staples had grown since his first injury so that he paid upward of $12,000 a year in freight charges on shipments to him. Two of the filling stations were conducted by men employed on salary or commission. The Staples business was conducted by an employe on a salary basis. This court, in affirming a verdict for plaintiff, said (197 Minn. 209, 266 N. W. 701):

"* * * A person possessed of capital and some talent for business may engage in an occupation for profit though bound to his bed by disease or infirmity, by employing others to do the work. But we do not think the clause in the insurance policy here involved, 'if any employee * * * becomes totally disabled and presumably will thereafter during life be unable to engage in any occupation or employment for wage or profit,' should be construed to mean that the insured must prove not only that he is so disabled physically that he cannot earn wages in his usual occupation or any other for which he may fit himself within a reasonable time, but must also prove that the disability is such that he could not by the employment of others conduct a business for profit. An occupation here must have the same meaning as employment, that

is, either working for wages when employed by another, or for the reward or profit obtained from one's own labor in an occupation or vocation. If the evidence had shown that plaintiff had the physical ability to do the work or a substantial part of the work in the business he had at Staples, it would have defeated a recovery; but when the jury could find that he was disabled from doing or attending to any but a trifling part and had to employ others to perform substantially the whole thereof, we think a recovery was warranted."

That plaintiff here was unable to do the substantial and material acts of his specialty has enough support in the evidence to prevent our determination otherwise as a matter of law. As has been indicated, the fact that he had, on the face of statistics, a substantial income would not bar a recovery under considerations which we have set out. The case has presented a difficult problem, but in our opinion the result we have arrived at is correct.

It would seem that, even if the policies in their entirety do not indicate the intention of the parties, the contracts, being ambiguous, should be interpreted against the insurer. Adopting this approach, it must be held that the policies insure against disability to do the substantial and material acts of the insured's usual profession or occupation, and that the challenged instruction to the jury was not erroneous.

Order affirmed.

MR. CHIEF JUSTICE LORING took no part in the consideration or decision of this case.