Walter W. LAIDLAW, Respondent,

v.

The COMMERCIAL INSURANCE COMPANY OF NEWARK, New Jersey, Appellant.

No. 46856.

Supreme Court of Minnesota.

June 3, 1977.

Rehearing Denied July 29, 1977.

Geraghty, O'Loughlin & Kenney, James R. Gowling and James W. Kenney, St. Paul, for appellants.

DeParcq, Anderson, Perl, Hunegs & Rudquist, Richard G. Hunegs, and O. C. Adamson II, Minneapolis, for respondent.

Heard before MacLAUGHLIN, SCOTT and STAHLER, JJ., and considered and decided by the court en banc.

THOMAS J. STAHLER, Justice.*

Walter Laidlaw brought this action against the Commercial Insurance Company of Newark, New Jersey, seeking total disability benefits allegedly due under an insurance policy. The district court sitting without a jury awarded plaintiff the disability benefits. Defendant appeals from the denial of its motion for amended findings or, in the alternative, for a new trial and from the judgment. We affirm.

In 1960, plaintiff, an attorney, obtained a "Professional Men's Disability Policy" with defendant. The policy provided for the payment of specified sums in the event of death or dismemberment and weekly payments of $250 for total disability.[1] The payments were to continue up to 5 years for any occupational disability which prevented plaintiff from performing the duties of the occupation he was engaged in at the time of the accident and were to continue indefinitely for any general disability which prevented plaintiff from engaging in any gainful employment for which he was suited.

On June 19, 1964, plaintiff sustained an injury to his left wrist in a power lawn-mower accident. His left hand, which was practically severed at the wrist, was surgically reattached and now appears as a "claw" which is virtually useless. The injury has also caused unusual, severe pain known as causalgia, which is apparently permanent. Plaintiff claims that the deformed hand and accompanying pain have caused psychological problems rendering him totally disabled in both the occupational and the general sense.

Plaintiff's evidence of disability tended to show the following: Prior to his injury, plaintiff was a very energetic, high-strung, hardworking person. He maintained an active solo law practice, engaging largely in trial work. Since his injury he has suffered from constant pain, acute anxiety, depression, and frustration, accompanied by a variety of physical complaints, such as headaches, bowel disorders, stomach cramps, and insomnia. He has made occasional attempts to work, followed by long periods of inactivity. As a result, his law practice has deteriorated; he closed his downtown Minneapolis office in 1966 and moved his files into his home. Despite the irregularity of his law practice, he has earned substantial income. Plaintiff's experts, treating physicians, psychiatrists, and attorneys who knew him, testified that in their opinion plaintiff was totally disabled during the time period at issue.[2]

Defendant received notice of the accident shortly after its occurrence. In January 1965, defendant first received proof of loss. Defendant requested further information

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

1. The policy which originally provided for $100 per week disability was increased to $250 before the accident at issue.

2. Dr. Robert Blomberg, a specialist in internal medicine who has had frequent contact with plaintiff since the accident, testified as follows:

"Q Now, Doctor, do you have an opinion based upon a degree of medical certainty, keeping in mind your training and experience, your treatment of this man, and the symptoms you have described to us, as to whether or not he is capable of performing the duties and tasks on a regular sustained basis of an attorney practicing law?

"A Yes, I do.

* * * * * *

"A Now, I don't think that he's able to continue on a sustained basis to practice law.

"BY MR. HUNEGS [Plaintiff's counsel]:

"Q Why do you feel that way, Dr. Blomberg?

"A Well, I feel that because of the causalgia, there may be times that he can whip him-

and undertook its own investigation of the claim. In March 1965, it paid $3,750 for total disability up to October 30, 1964, less a 4-week waiting period; in May 1965, it paid an additional $1,750 for total disability to December 18, 1964. After this payment, defendant made a number of requests for further information, and plaintiff made some attempt to comply. Defendant made

no further payments but did not deny liability at that time. On August 10, 1967, a complaint, which was never served, was filed in the Federal District Court requesting relief similar to that requested in this action; the suit in Federal court was voluntarily dismissed by plaintiff without prejudice in August 1968. After another demand for payment, defendant wrote plain-

self up physiologically and psychologically enough to work for a period of time, but I think that such things as fatigue or emotional setbacks will cause the causalgia to take over as a ruling force in his life and he will be unable to function.

"Q Doctor, do you have an opinion based upon reasonable medical certainty, keeping in mind your training and experience and your treatment of this man, your diagnosis of his condition and your findings, whether or not Walter Laidlaw can, on a regular and continuous basis, perform any duties or tasks in a job or employment on a regular and sustained basis in any area for which he may be fitted?

"A I do.

"Q What is your opinion, Doctor?

"A I think it's the same as my opinion relating to law. I don't think he would be able to on a sustained and regular basis perform."

Dr. Donald R. Daggett, a psychiatrist, testified to the same effect.

Kenneth W. Green, an attorney, who had known plaintiff for some years, testified as follows:

"A Well, my opinion is that he is not able to carry on the practice and he has not been able during those years to carry on the practice of law, and the reason is, if you want that, the personality difficulties that he has had since the time of the accident, this deteriorating situation—even the appearance of his eyes manifest that. His inability to come to a decision, his inability to stay stable temperamentally, his inability to focus on a problem and stay with it long enough, his stamina, and even his reaction to the disfiguring situation that he's got and the pain that he's got * * *. * * *

*     *     *     *     *     *

"A I'd say the other basis for it, I perhaps didn't say this, but I just don't think he can stay with it long enough, and he might be able to come down on some sort of an apparent stop-gap basis, maybe make an appearance in court or something like that, but the office and the daily running of it and so on are still in chaos. That's not practicing law.

"Q Can you practice law without carrying on your work on a regular sustained continuous basis, Mr. Green?

"A You wouldn't have a practice to carry on if you can't do that.

"Q * * * Do you have an opinion as a lawyer with the same education, training and experience that he had as to whether—and keeping in mind your own training and experience, Mr. Green, your knowledge of this man before and after his injury, your knowledge of his appearance and ability to cope with everyday matters—do you have an opinion whether he, from January 1, 1965, until the present date is able to carry out on a regular sustained and continuous basis any work for which he is fitted by reason of his training, education and experience?

*     *     *     *     *     *

"A Yes, I have an opinion.

"BY MR. HUNEGS:

"Q What is your opinion, Mr. Green?

"A Well, my opinion is that he can't, if I understand your question, despite the apparent wording of the policy. I think we are aware it isn't interpreted that literally, and I don't want to get into that. But he can't, in my opinion, and I think the reason is the matters that I have described, and, in addition, the practice of law or related things are, in effect, they are a communicating business. You have to be able to communicate with people. You have to be able to get along with them. You have to be able to have some tact. You have to have some insight into their problems, and I don't think he's had that. I haven't seen much of him for the very frank reason that it's just been too unpleasant to see him, and that's—I don't think that's my experience alone. It's too tough to take. You are not dealing with a person who's capable of being in some sort of work where it takes judgment or dealing with people. I came to court a year ago to testify in this, and, though I would hope to consider myself a friend of his, he won't even speak to me, and his whole pattern has been that he is—he has tended to absolutely tear up verbally the people who have been the closest to him and tried to help him the most, and a person who can't do that can't be involved in that kind of work or anything like it."

William T. Egan, another attorney, also testified that plaintiff was unable to function as a lawyer.

tiff in March 1970, denying further liability under the policy. On December 11, 1970, plaintiff, employing different counsel, commenced the instant action.[3]

On December 4, 1974, plaintiff and defendant entered into an agreement to settle the case for $39,000 in the chambers of Honorable A. W. Danielson. By order dated May 29, 1975, Judge Danielson denied a motion by defendant to enter a dismissal upon payment of the $39,000 to the clerk of court, in effect nullifying the settlement on grounds of mutual mistake.

Trial began before Honorable Stanley D. Kane in November 1975. The trial court held that the action was not barred by the statute of limitations and that plaintiff was totally disabled in both the occupational and the general sense.

The policy contained the following provisions, as required by Minn.St. 62A.04, subd. 2:

"PROOFS OF LOSS: Written proof of loss must be furnished to the [Company] at its said office in case of claim for loss for which this policy provides any periodic payment contingent upon continuing loss within 90 days after the termination of the period for which the [Company] is liable and in case of claim for any other loss within 90 days after the date of such loss. * * *

* * * * * *

"LEGAL ACTIONS: No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished."

The trial court took the view that under the proof-of-loss provision "the period for which the [Company] is liable" means the aggregate period of liability and that the statute of limitations does not begin to run until 90 days after the end of such period. Defendant claims that "the period for which the [Company] is liable" refers to each monthly period for which it may demand proof of continuing disability under the "payment of claims" provision. Under defendant's construction, plaintiff would be required to furnish proof of loss within 90 days of December 18, 1964, the expiration of the period for which the company paid benefits, which would be some time in March 1965, and he would be required to commence the action within 3 years of that date.

**1–2.** The usual rule of construction most favorable to the insured does not apply to a provision required by statute. *Johnson v. Central Life Assurance Society*, 187 Minn. 611, 246 N.W. 354 (1933); *Cement, Sand & Gravel Co. v. Agricultural Ins. Co.*, 225 Minn. 211, 30 N.W.2d 341 (1947). However, we believe the most natural interpretation of the phrase "the period for which the [Company] is liable" is that adopted by the trial court. This conclusion is supported by a portion of the "Time of Payment of Claims" section of the policy, which provides:

"* * * Subject to due written proof of loss, all accrued indemnities for loss for which this policy provides periodic payment will be paid [at the expiration of each four weeks during the continuance of the period for which the Company is liable * * *.*"

From the context of this sentence it is clear that "the period for which the [Company] is liable" refers to the total continuous period of liability, be it short or long, and not individual 4-week periods. It is reasonable to infer that this phrase has the same meaning in both sections of the policy. We note that the Kentucky Court of Appeals

---

3. Plaintiff explained that his somewhat inconsistent behavior in pursuing this claim was a result of his varying mental state, in that at times he was afraid of accepting disability and possible disbarment.

has reached the same conclusion in construing this identical phrase. *Continental Cas. Co. v. Freeman*, 481 S.W.2d 309 (Ky. 1972).

We recognize that under our interpretation the statute of limitations does not begin to run until 90 days after the death of the insured in the case of permanent disability for which the policy provides lifetime benefits. Defendant exaggerates the consequences of this holding. An insured is not likely to wait years before filing proof of loss because he will want to receive benefits as soon as possible. He is required to give prompt notice of his claim, which was done in this case. If the insurer is actually prejudiced by a delay in presenting a claim, the claim may be barred by principles similar to those underlying the doctrine of laches. *Mitchell v. Equitable Life Assur. Soc.*, Minn., 245 N.W.2d 618 (1976). There is no indication of actual prejudice to defendant by reason of the delay in filing the instant suit. Defendant was notified of the claim and as a result conducted its own independent investigation. Although the investigator recommended a physical examination in the spring of 1965, defendant declined to arrange one. An interoffice memo explained that "[t]he danger in having the insured examined by an impartial physician at this time is that the examiner may feel the insured is totally disabled in spite of the fact that he actually is doing some of his work." Under these circumstances, any failure to discover relevant facts must be the responsibility of the defendant.[4]

3–4. Defendant also challenges the trial court's findings of total disability in both the occupational and general sense. Total disability does not mean a state of absolute helplessness or inability to perform any task relating to one's employment. When used in the occupational sense, it means the inability to perform the substantial and material parts of one's occupation in the customary and usual manner and with substantial continuity. *Blazek v. North American Life & Casualty Co.*, 251 Minn. 130, 87 N.W.2d 36 (1957). When used in the general sense, it means the inability to perform the substantial and material parts of any gainful occupation with reasonable continuity. *Stroncek v. Berkshire Life Ins. Co.*, 292 Minn. 57, 193 N.W.2d 286 (1971). The mere fact that the insured is earning some income does not negate the existence of total disability. *Blazek v. North American Life & Casualty Co., supra; Weum v. Mutual Benefit Health & Accident Assn.*, 237 Minn. 89, 54 N.W.2d 20 (1952). In the *Weum* case, we stated:

> " * * * Total disability in an occupation is to be measured by the absence of individual earning capacity rather than the absence of income." 237 Minn. 108, 54 N.W.2d 31.

Although *Weum* involved occupational disability of a physician specializing in obstetrics and gynecology, this principle applies to general disability as well.

5. The facts present in *Stroncek v. Berkshire Life Ins. Co., supra*, bear some resemblance to those present here. In that case the insured, a construction contractor, suffered from frequent headaches, fainting spells, and dry heaves, and as there was expert opinion that he was unemployable as a result of this condition, we affirmed a jury verdict for the insured.

In the instant case, the insured continued to earn a substantial, although reduced, income. This income was derived largely from a single source, insurance

---

4. The trial court in addition found that defendant was estopped from strictly enforcing the proof-of-loss provisions. In view of our conclusion that the "period for which the Company is liable" is the total period of disability, we find it unnecessary to consider this point.

claims for airline pilots.[5] It was at least possible to infer that without this source of income plaintiff would not be able to earn any substantial amounts due to his severe psychological problems and physical pain. As we view the evidence, it is by no means convincing as to the existence of total disability. However, the findings of the trial court are not to be disturbed on appeal unless clearly erroneous. Rule 52.01, Rules of Civil Procedure. We cannot say the findings are clearly erroneous in this case.

6. Defendant lastly contends that the trial court erred in setting aside the settlement of December 1974. The trial court may in its discretion vacate a settlement on grounds of mutual mistake. *Schoenfeld v. Buker*, 262 Minn. 122, 114 N.W.2d 560 (1962). It did so in this case because of an apparent misunderstanding concerning the coverage afforded a successor corporation's insurance policy. Judge Danielson's memorandum accompanying his order states that the settlement was intended to preserve plaintiff's right to seek benefits for future disability from the successor insurer. However, it later appeared that the successor's policy excluded such coverage.[6] There is no evidence in the record to controvert Judge Danielson's recollection of the circumstances of the settlement. We therefore hold that his order was not an abuse of discretion.

The order and judgment appealed from are affirmed.

Affirmed.

---

**5.** Some of the income resulted from post-accident billing for pre-accident work.

**6.** Judge Danielson's memorandum explained: "The difficulty involved in the particular case before the court at this time arises from the fact that the policy of insurance underwritten by The Commercial Insurance Company of Newark, New Jersey, terminated on or about April 1, 1966, and a subsequent policy then went into effect underwritten by the Fireman's Fund Insurance Company. During all negotiations concerning settlement, it was apparent that plaintiff's counsel did not want to stipulate away the plaintiff's right to claim future disability arising from the injury to his hand. This intent was apparent to the court during negotiations with counsel for The Commercial Insurance Company and also was reflected in the subsequent negotiations with the other insurance carriers which resulted in the settlement of those cases. In neither of the latter cases, was plaintiff's right to make such a claim disposed of by stipulation."