EARA I. NEEMAN, APPELLEE, v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, APPELLANT.

153 N. W. 2d 448

Filed October 13, 1967. No. 36562.

Mason, Knudsen, Berkheimer & Endacott, for appellant.

Ginsburg, Rosenberg, Ginsburg & Krivosha and R. P. Cathcart, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

Plaintiff, beneficiary of a life insurance policy with accident provisions issued by defendant, obtained verdict and judgment for the accidental death benefit. Defendant contends on appeal that the evidence of a causal relationship between accident and death is insufficient. The general circumstances are preexisting coronary artery disease, accidental injury, and sudden death caused by acute coronary insufficiency.

The policy provides in part: "The Company * * * agrees * * * to pay * * * an Additional Benefit * * * upon * * * proof * * * that * * * death was caused directly, independently and exclusively of all other causes, by a bodily injury sustained solely by external, violent, and accidental means * * *. EXCEPTIONS AND EXCLUSIONS: * * * nor shall such Additional Benefit be payable if death results, directly or indirectly, or wholly or partially, (1) from any bodily * * * disease or infirmity * * *."

The insured, Carl Neeman, died in Lincoln, Nebraska, on June 11, 1965, at age 64. His height and weight were 5 feet 6 inches and 168 pounds. Prior to 1964 Carl had been healthy, but in April 1964 chest pains hospitalized him 2 weeks. Dr. Wilbur G. Wiedman, a general practitioner, diagnosed hypertensive cardiovascular disease for which drugs were prescribed. The next month he noted normal blood pressure and improvement.

Severe chest pains necessitated hospitalization of Carl from June 22 to 30, 1964. Dr. Wiedman diagnosed hypertensive cardiovascular disease and coronary insufficiency for which vasodilators were prescribed. He assumed the presence of an arteriosclerotic condition.

About July 15, 1964, Carl returned to his job at Good-

year Tire and Rubber Company. Conditions of work, the operation of a machine which cut stock for belts of different sizes, compelled him to stand. This level of activity appeared safe, although Carl occasionally took a nitroglycerin tablet. A medical examination on August 27, 1964, disclosed blood pressure at 140 over 90 and lung fields, clear. Carl worked until he was hospitalized from February 15 to March 6, 1965, because of flu. The company then put him on hospital leave.

Entering the hospital again on April 19, 1965, Carl complained of severe chest pains which radiated to both arms. Upon arrival at the emergency ward, however, he felt better. Records show blood pressure, 110 over 74; lung fields, clear; heart sounds, normal in rhythm, rate, and intensity; and condition good—"mostly pain-free; probably just angina."

Dr. Wiedman last saw Carl on June 3, 1965, 8 days before the accident. Examination showed blood pressure, 140 over 94; lung fields, clear; and heart sounds, normal. Chest pain which had diminished, occurred with any amount of exercise. The clinical symptoms of heart disease were abnormal for a person at age 64. Carl intended to return to work at the expiration of his leave on July 9. Dr. Wiedman concluded that in spite of the gradual increase of strength and decrease of symptoms, Carl then was unable to tolerate the work.

Carl's activities during the 1-month period preceding his death consisted largely of the following: Training, shoeing, and riding horses; driving a pony and cart in a horse show; and gardening. He tuned a truck motor on the day before the accident, replacing points and plugs. The next morning he arose at 8:30. After breakfast he left the house to transport sawdust to a horse barn, the truck to be loaded by an automatic device. At the barn he spread three bushels of sawdust in a box stall. After a leisurely lunch at home he left to get another load of sawdust which he intended to deliver in the evening. His widow had not noticed during that 1-month period

any speech impediment, dietary difficulty, emotional up-
set, labored breathing, or pain.

The only eyewitness to the accident was Thomas J.
Mehan. His home was located on the south side of
Judson Street west of a T intersection formed by the
south dead end of Sixty-second Street. It was the third
house west of a point south of Carl's home which stood
at the northeast corner of the intersection. The Mehan
driveway, 50 feet long, declined northward to a point
near Judson Street.

About 2:30 p.m., Carl drove the truck east on Judson
Street and past Mehan, who was standing on a skate-
board at the top of the driveway. Carl's appearance was
not remarkable. Mehan then skated for 10 to 15 seconds
to the bottom of the slope, where he immediately looked
eastward. The truck faced north on Sixty-second Street
near the east curb a short distance from the intersection.
Without a driver and with the left door open, it was
rolling back "a little bit." The wheels were turned so
that the front tended to swing away from the curb. In
the street Carl was facing the inside of the open door.
He was "down in a crouched position pretty low, and the
door was just hitting him." The bottom part of the door
collided squarely with his face. He fell northward and
the open door passed over him. The truck stopped with
the left front wheel against his right leg below and
near the kneecap. The right rear wheel "might have
been a foot or so" from the curb. Carl lay face down,
moaning "a little bit." Door and face were stained with
blood. If Carl had moved away and then returned to
the truck, Mehan would have seen some movement, he
testified, because of the short time interval.

Carl died suddenly, probably a few minutes after the
accident. An ambulance attendant applied external
cardiac massage at the scene and in the ambulance en
route to the hospital. At the trial he could not recall
whether he had fractured Carl's sternum.

A pathologist, Dr. Frank H. Tanner, had performed an

autopsy on the unenbalmed body. The protocol of the post mortem examination in which grade IV represents the most advanced stage of arteriosclerosis, reads in part as follows:

"GROSS AUTOPSY FINDINGS. * * * *THORAX* * * In reflecting the anterior thoracic cage, one notices that there is a transverse fracture in the mid-portion of the sternum with a small amount of extravasation of blood in the soft tissues underneath the sternum. This together with a costal cartilage separation in the left side is quite characteristic of injury that may occur in the course of manual cardiac massage. * * *

"GROSS ANATOMIC FINDINGS 1. Diffuse, severe coronary arteriosclerosis with old * * * thrombotic and atherosclerotic occlusions of the coronary lumena and with extensive, fibrous scarring * * * of the myocardium. * * * 2. Probable acute coronary insufficiency with sudden death—clinical." (Radiology report: "* * * fracture of the nasal bone with some downward depression of the distal fractured fragments.") "4. Generalized, arteriosclerosis, severe (aorta grade II to III, cerebral vessels grade IV, coronary vessels grade IV). * * * 12. Transverse fracture of sternum, no doubt secondary to external cardiac massage enroute to hospital * * *.

"NOTE: * * * this individual suffered some facial soft tissue and bony damage as a result of an accident * * *. I do not believe that the anatomic findings justify any conclusion that the death was associated directly with trauma. There is no evidence of damage to the underlying soft tissues of the brain or meninges. The patient exhibits profound, diffuse, coronary artery disease sufficient to produce fatal, acute, coronary insufficiency at any time. There is evidence of old scarring of the myocardium * * *. I would attribute his death to coronary insufficiency associated with arteriosclerotic heart disease. * * *

"SUMMARY OF MICROSCOPIC FINDINGS 1. Severe, diffuse, coronary arteriosclerosis with marked nar-

rowing of the coronary lumina involving all three major branches and with extensive myocardial fibrosis and scarring. (Acute, coronary insufficiency—see gross protocol) 2. Generalized arteriosclerosis with particular involvement of the aorta."

Dr. Stephen W. Carveth, a specialist in thoracic, cardiac, and vascular surgery, testified for the plaintiff. His opinions were based on the protocol and hypothetical facts. He assumed that Carl had been free of pain during the 1-month period before death. No pain was supposedly associated with the cardiovascular responses to energy expenditures at the level of activity described by the widow.

Dr. Carveth attached importance to collateral circulation and to the finding that all three coronary arteries had been open at death. If an occlusion has occurred, it is ordinarily seen on post mortem examination. Carl had been in an advanced stage of the disease but not on his death bed. Dr. Carveth classified him in the middle zone of people age 64. The psychic factor of fright, the collision, or both had induced fibrillation and death. "* * * he experienced a stressful reaction which caused his underlying condition to develop in an arrest or fibrillation and cause his death."

In the opinion of Dr. Tanner, Carl was sitting on a powder keg. Death might have occurred at any time from a variety of causes or from no cause at all. The relative responsibilities of the underlying disease process and the accident were speculative. Dr. Lee Stover, an internist, who had not seen Carl, and Dr. Wiedman also had no opinion.

The quoted provisions of defendant's insurance policy are not the test of causality. For garden-variety clauses the beneficiary may recover upon proof of an accident that was an active, efficient, and precipitating cause of death. See Long v. Railway Mail Assn., 145 Neb. 623, 17 N. W. 2d 675. Set by present medical knowledge and

prevailing social philosophy, the Long test of causality holds.

In combination several facts are prominent: The complaint of chest pain to Dr. Wiedman on June 3, 1965; the short interval between the observations by Mehan; the position of Carl at impact; and the findings on post mortem examination. The evidence is insufficient to sustain the verdict for plaintiff.

The judgment is reversed and the cause remanded with directions to dismiss plaintiff's petition.

REVERSED AND REMANDED WITH DIRECTIONS.

SPENCER, J., dissenting.

I do not agree with the majority opinion. To do so would be to ignore the testimony of plaintiff's expert medical witness. The credibility of witnesses is a question for the jury and not this court. The opinion refers to the case of Long v. Railway Mail Assn., 145 Neb. 623, 17 N. W. 2d 675. I agree this case is in point and would apply the rule enunciated therein. We there held that where it was difficult to determine whether the accident or preexisting disease or condition was the motivating or precipitating cause of death, it necessarily becomes a question of fact for the jury.