**CONTINENTAL CASUALTY COMPANY,**
**Appellant,**

v.

**Raymond FREEMAN and Bertie Freeman,**
**Appellees.**

**Raymond FREEMAN and Bertie Freeman,**
**Cross-Appellants,**

v.

**CONTINENTAL CASUALTY CO.,**
**Cross-Appellee.**

Court of Appeals of Kentucky.

April 28, 1972.

Rehearing Denied June 30, 1972.

William H. McCann, Frank Reaves, Jr., Brown, Sledd & McCann, Lexington, for appellant.

Gardner L. Turner, Sturgill, Moreland & Turner, Lexington, for appellees.

PALMORE, Judge.

The appellee Raymond Freeman was insured by the appellant, Continental Casualty Company, under a group mortgage protection policy under which he was entitled to receive $100 per month while disabled and wholly unable to engage in his occupation by reason of sickness or injury caused by an accident. He received an accidental injury on June 25, 1963, and promptly submitted a proof of loss to the company. On August 22, 1963, the company tentatively denied the claim, and on September 5, 1963, after reviewing the claim and securing a report from Freeman's surgeon, Dr. Harvey Chenault, it categorically denied liability. Freeman remained continuously disabled for five years, the maximum period covered by the policy, following which he brought this suit and recovered a verdict and judgment of $6,000, from which the company appeals.

The first point of controversy concerns that clause of the policy entitled "Legal Actions," which provides as follows:

"No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is *required to be furnished.*" (Emphasis added.)

The clause entitled "Proofs of Loss" reads as follows:

"Written proof of loss must be furnished to the Company at its said office in case of claim for loss for which this policy provides any periodic payment contingent upon continuing loss within ninety days after the termination of *the period for which the Company is liable.* Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required." (Emphasis added.)

The trial court construed this clause as meaning that Freeman was not "required" to furnish a proof of loss until the end of the 5-year period for which he claims the company was liable. The company contends that in view of the type of policy it can have but one sensible meaning, which is that a proof of loss is required within 90 days after each *monthly* period for which the policyholder is entitled to indemnity. The company points out also that the above-quoted policy clauses are required by statute, KRS 304.712, 304.720, 304.724, for which reason the familiar rule of construing the terms of an insurance policy most strongly against the insurer should not apply.

We need not consider the rule of construction, because we agree with the company that the clause is not ambiguous and that there is no reason not to construe

it as meaning just what it says. Our only difference on this point is that we do not think it says what the company contends it says. It means either (a) that one proof of loss will suffice for one continuous period of liability or (b) that each month of continuing loss must be covered by a proof of loss submitted within 90 days thereafter. Neither of these alternatives would appear to achieve an entirely satisfactory arrangement, but we see no room for any other possible construction of the sentence as it is worded. The most natural import of the expression "the period for which the Company is liable" is the total continuous period, be it five days or five years. In support of that construction it is interesting to note that the clause entitled "Monthly Indemnity" provides that indemnity "is not payable for the first fifteen days of any period of disability." Unless the word "period" has a different meaning from one clause to another the definition espoused by the company in this case would result in a claimant's being unable to recover for the first 15 days of each monthly "period" of disability.

The other principal contention made by the company is that it should have had a directed verdict because the evidence did not justify a finding that the claimant's disability was attributable to an injury "caused by an accident occurring while the policy [was] in force and resulting directly and independently of all other causes," that being the applicable condition of coverage.

Freeman was a carpenter by trade. He sustained some degree of back injury in 1948 but responded to conservative treatment and apparently recovered completely. Another injury in 1958 resulted in spinal surgery, from which he also recovered and resumed his normal activities, though he wore a back brace whenever he expected to do heavy lifting. He sprained his back again in 1961 and was in the hospital for several days of bed rest, but he says the reason for the hospitalization was severe headaches which were not related to the back trouble. After this incident he re-turned to his usual occupation and in the year 1962 built five houses and remodelled two. He says that during this period he was able to do and did all of the things he had ever done. The insurance here in question was issued on October 9, 1962, incident to the purchase of a new home.

The last injury, out of which this litigation arises, occurred on June 25, 1963, while Freeman was working. It resulted in further spinal surgery which appears not to have been successful. It is not disputed that from an occupational standpoint he has been wholly disabled ever since.

The policy covers accidental injury only if it (1) occurs while the policy is in force, and (2) is the direct and independent cause of total disability. If, therefore, the disability depends to some extent on another cause or causes it does not fall within the literal terms of the policy. In brief, the company's argument is that on the basis of the evidence in the record reasonable minds are bound to conclude that Freeman's disability resulted to some extent from the diseased or injured condition of his back prior to the particular injury that occurred while the policy was in force.

Contractual language limiting the insurer's risk to those losses which result from injuries (or sickness) independently of all other causes commonly appears, with variations, in accident and health policies and in the double indemnity feature of life policies.

In an absolute sense no single event can ever be the "exclusive" cause of a disability, and for that reason there must be some rule or principle by which a separation can be made between those causative factors that are legally inconsequential and those that must be recognized in determining whether under this condition of coverage a specific illness or injury is the sole and independent cause of the disability or death.

There is a comprehensive annotation on the subject at 84 A.L.R.2d 176 styled, "Pre-existing physical condition as affect-

ing liability under accident policy or accident feature of life policy." See also Appleman, Insurance Law and Practice, § 403 et seq. (rev. ed. 1965), and Couch on Insurance 2d § 41.2 et seq. (2d ed. 1962). As may be seen from these text materials, case law throughout the country presents a wide divergence of viewpoints, from extremely strict to extremely liberal, on the question of what really is an exclusive, independent or sole cause of loss under this type of policy. Our own cases, speaking usually in generalities, do not provide much insight. As pointed out in 44 Am. Jur.2d 113 (Insurance, § 1270), "in principle the courts are, in substance, agreed," yet it is another matter when abstract theory is applied to earthen facts.

Some authorities hold that if the harm (i. e., the disability) would not have occurred *but for* a pre-existing disease or infirmity it is not independently attributable to the injury. Others hold that if nevertheless an accidental injury is the "proximate" or "primary" cause the loss is covered. See 84 A.L.R.2d 199 et seq., in which cases from this court are cited for both propositions. Still others draw a distinction between those policies which, as in this instance, simply cover loss "resulting directly, independently and exclusively" from the injury and those which contain an additional clause specifically excluding disability "wholly or in part, directly or indirectly, from disease or other bodily infirmities," or similar phraseology. 84 A.L.R.2d 176, 185; Couch on Insurance 2d § 41.380 (2d ed. 1962). Our case of Prudential Ins. Co. of America v. Gaines, 271 Ky. 496, 112 S.W.2d 666 (1938), a double indemnity life case, is cited as giving effect to this distinction. 84 A.L.R.2d at 187.

According to *Couch*, the expression "resulting directly, independently and exclusively" refers to the "efficient, substantial, and proximate cause" of the disability, and if the accidental injury combines with a pre-existing disease to cause total disability which would not have occurred otherwise, the injury is deemed to be the proximate cause; but if the insurer's liability is further restricted by a clause excluding liability where death or disability results directly or indirectly from disease or from bodily or mental infirmity, it is not enough to establish a direct causal relation between the accident and the death or·disability, and if the evidence points to a pre-existing infirmity or abnormality which may have been a contributing factor the plaintiff must show that the resulting condition was caused solely by external and accidental means. Couch on Insurance 2d, § 41.380 (2d ed. 1962).

We are not satisfied with this distinction, because if the word "independently" is strictly and literally construed it necessarily excludes other contributing causes, without any express provision to that effect. As we see it, the problem is to define the degree of importance the contributing causal factor must have had in order to negate the accidental injury's having been the "sole," "exclusive" or "independent" cause of the disability.

No doubt an absolutely literal construction of the policy language, applying a "but for" criterion, would achieve what the insurance companies desired when they drafted or adopted it, but we do not believe it would represent what the purchasers of such policies think they are getting when they buy them. Cf. Abbott v. Travelers' Ins. Co., 208 Mich. 654, 176 N.W. 473, 481 (1920), discussed in 84 A.L.R.2d at 208.

Despite some differences with respect to the weight of the opinion evidence and the criterion of liability this case is quite similar to Couey v. National Benefit Life Insurance Co., 77 N.M. 512, 424 P.2d 793 (1967), in which the plaintiff had experienced a history of back trouble, including a laminectomy in 1958, a spinal fusion at the same level in 1961, and a further hospitalization for back trouble in 1962, before being reinjured in 1963. In affirming a judgment allowing recovery for the periods

of hospitalization following the 1963 incident the court commented as follows:

> "If we assume that the fall in 1963 redamaged an old injury or condition and the surgery performed to repair it, can it be said that the July, 1963 fall was the sole cause of the hospitalization? Stated differently—does liability arise if the proximate efficient cause of hospitalization is an accident which requires hospital residence, even though a pre-existing condition which may have been triggered or touched off thereby, or a latent, but theretofore unknown condition makes necessary a longer hospital stay than would normally result from the accident alone? We recognize the presence of cases which would support a negative answer. However, we think the better reasoning is found in those decisions which would answer in the affirmative."

> . . . . . .

> "In our view of the case, every injury or disease suffered by a person from his birth to the date of a particular injury contributes to some degree to the condition then present. Necessarily, by the words used in the policy it could not have been intended that payment would be due only when the accident was literally the sole cause of hospitalization. If a person had suffered a broken leg which had healed perfectly five years before, and a second accident wherein the leg had broken at the same place, could it be said that the condition resulting from the first break did not in any way contribute to the second break? We think the answer is obvious and, under defendants' theory, plaintiff would not be entitled to recover. In our view, this application of the language of the policy is entirely too restrictive and would be unreasonable. Other courts have agreed." (Citing cases.)

■ The rule stated in 44 Am.Jur.2d 1161 (Insurance, § 1271), is that a pre-existing disease or infirmity will prevent recovery under the policy if it "proximately causes or substantially contributes" to the loss. The term "proximate cause" is a venerated working tool of the law but undoubtedly must be a mysterious incantation to the average juror. Even among lawyers and judges it is hard to define and better to avoid when possible. The word "substantial," like "reasonable," is a little loose, but in so being it does allow for a comfortable fit. People recognize that it connotes a high degree of significance and importance. It has come to be the adjective most used in defining the quantum of evidence necessary to sustain a burden of proof. We think it can and should be employed in this type of case. That is to say, a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss. It is our further opinion that a "predisposition" or "susceptibility" to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere "relationship" of undetermined degree is not enough.

The question now to be considered within the framework of the foregoing premises is whether upon the whole case, including the evidence concerning Freeman's pre-existing condition and its relation to his disability following the 1963 accident, it would be clearly unreasonable for a jury to find that the accidental injury was the independent and exclusive cause of the disability. If not, the trial court committed no error in overruling the motions for a directed verdict and judgment n. o. v.

As already indicated, Freeman testified that in 1962 he "built five homes and remodelled two" and was able to do all the things he had done theretofore until 1963 when he was again injured. He conceded that each of the various injuries occurred in the same area of his back, and that he wore his back brace occasionally when he expected to do heavy lifting, because he knew he had a weak back. His wife corroborated this testimony.

Dr. Edward F. Counts, Jr., Freeman's family physician since 1956, testified that in his opinion the injuries of 1958 and 1963 were separate and unrelated. However, the probative value of this opinion was greatly compromised by two circumstances. First, he said that the 1958 surgery was limited to the L4–5 interspace and the 1963 surgery to the L5–S1 interspace, whereas Dr. Harvey Chenault, who performed the operations, and whose testimony was supported by the hospital records, testified that the 1958 surgery involved both spaces. Secondly, Dr. Counts admitted that he had not been informed of the 1961 incident and that if Freeman did in fact suffer another injury in 1961 he would not have an opinion as to whether the 1963 was a continuation of it.

Dr. Harvey Chenault first saw Freeman in 1948, at which time he prescribed conservative treatment for what was diagnosed as a ruptured disc on the right side at L5–S1, the injury having resulted from lifting a stove. The patient recovered fully. The next occasion was in 1958, when Freeman stepped unexpectedly from a high step and again hurt his back. This time Dr. Chenault operated and removed ruptured discs at L4–5 and L5–S1, following which he estimated that Freeman had a permanent partial disability of 10% to 15%.

In 1961 Freeman was put in the hospital by Dr. Ralph Angelucci while Dr. Chenault was temporarily out of town. According to Dr. Chenault, this hospitalization resulted both from a back sprain (suffered by Freeman while lifting a wall section) and from unrelated headaches, but in any event he did not then consider it to be an important episode from the standpoint of the back condition.

Dr. Chenault testified that when Freeman returned in 1963, after injuring his back while shoveling dirt underneath a house, he said he had never been entirely free of back pain since 1961. On this occasion, in 1963, Dr. Chenault performed a laminectomy, "which is removal of number 5 and complete removal of the recurrent rupture of the intervertebral disc at L5–S1," one of the same discs involved in the 1958 surgery. Dr. Chenault's testimony on direct examination culminated in the following opinion:

"I would say that from 1963 we were treating for the results of injury on top of a diseased area from previous injury. In other words there doesn't seem to be too much medical question but what the area of his re-injury was that of his previous injury which had left it in a diseased condition *or more susceptible to subsequent injury than normally would be.*" (Emphasis ours.)

In the course of ensuing cross-examination and redirect examination a great deal of equivocation and some outright contradiction developed. Whereas Dr. Chenault had estimated a 10% to 15% permanent partial disability following the 1958 operation, he now said "that was my opinion that he had completely recovered from it." Then, after reiterating that his estimate of disability in 1958, "based on the probability of subsequent difficulty in the same place," had been proved correct by time, he was confronted by a deposition given in a 1964 workmen's compensation proceeding, in which he had testified as follows: "I would say that the passage of time from 1958 to 1963 without any disabling recurrence of trouble would indicate that that assignment of disability had been, should we say abrogated or proven in error, or that assignment of disability had been wiped away by the fact that he continued to work as he said he did."

At this point it is necessary that we digress for a moment to discuss the status and effect of Dr. Chenault's 1964 deposition. Counsel for the insurance company objected strenuously and often to the reading of portions of this deposition to Dr. Chenault, and moved that such references be stricken on the ground that the testimony had been elicited in another pro-

ceeding involving other parties and other lawyers. It is now contended that it was improperly received both as substantive evidence and for impeachment. Unquestionably, however, statements made by a witness at another time and place that are inconsistent with his testimony in the proceeding at hand are admissible, when properly founded, for the purpose of impeaching his credibility. If they were treated by the jurors in this instance as substantive evidence, it was only because the jurors were not admonished otherwise. Without an admonition such evidence *is* substantive. The difficulty here is that the transcript does not indicate that any limiting admonition was requested. Hence there was no error in failing to give it. Stanley's Instructions to Juries, § 16.

Returning now to the substance of Dr. Chenault's testimony, we find that on cross-examination in this proceeding he said he "thought there was" a predisposition on Freeman's part to injury in 1963, whereas in his 1964 deposition he had testified as follows:

Q — "Even though you testify that there was a second injury, I say could it have aggravated the condition that you operated on the man for in 1958?"

A — "I'm not trying to be unhelpful. I have difficulty in answering that. I think we almost from a medical standpoint have to assume that when he hurt his back in 1948 lifting a cook stove that there was some weakness in this disc, in the same manner that a man gets a rupture in his groin from lifting perhaps a bucket of water, which people lift all the time without getting ruptures in their groin, and I think similarly you would have to assume that there was some pre-existing weakness that predisposed him to these injuries when he ruptured his disc in 1958 and the same in 1963, but I feel that the ruptured and operative discs of 1958 had healed or he would not have been able to do the work that he says he did in those intervening

years and that the injury of 1963 was a separate one from the injury of 1958."

Q — "But there was this predisposition to injury in 1963?"

A — "I think I could answer that no, and I don't believe that that is contradictory to the answer I gave awhile ago because you spoke of lighting up an asymptomatic and non-disabling weakness, and I said that this was a possibility, and I believe that the answer to this question, 'no', is not contradictory to the other answer."

In the same deposition, on redirect examination and in response to the question, "Would we be correct in saying that Mr. Freeman had a pre-existing back condition, that his back was not normal?" Dr. Chenault replied, "I think we should have to say that, yes, sir." In the trial of this case he reiterated that his answer would be the same.

After reviewing and considering Dr. Chenault's testimony at some length we are inclined to the view that it was best summed up in these questions and answers:

On direct:

Q — "Doctor, do you have an opinion as to whether or not the injury of 1963 resulted in a disability to Mr. Freeman directly and independently of all other causes?"

A — "Yes sir."

Q — "What would your opinion be?"

A — "My opinion would have to be that I could not say that the injury of 1963 was the sole and independent cause of disability unrelated to any previous trouble he had had because he had had other injuries from 1961 and had more or less continuous complaints or on and off complaints."

On cross:

Q — "Doctor, Assuming Dr. Counts stated that the injury in 1958 and the

one in 1963 are separate, distinct and unrelated, would you agree with that opinion?"

.    .    .    .    .    .

A — "I'm not quite clear the way the question has taken . . . I believe I indicated earlier today that I was unable to say that the injury of 1963 was totally unrelated to his previous injury. That might be about the best I can do."

The most, therefore, that Dr. Chenault was willing to say was that Freeman's existing condition predisposed or made him more susceptible to re-injury than would otherwise have been the case. Though he could not say the 1963 injury *was unrelated* to the previous trouble, he could not bring himself to say that in his opinion it *was related*. Conceding that he knew more about Freeman's history and condition than did Dr. Counts and, in fact, disregarding the Counts testimony *in toto*, Dr. Chenault's testimony certainly does not provide much enlightenment on the degree of relationship between the pre-existing condition and the ultimate disability.

We do not overlook the fact that according to Dr. Chenault's recorded case history and the hospital record made when Freeman was admitted in 1963 he had experienced more or less continuous difficulty with his back after the 1962 episode. Nevertheless, there always is room for error between memoranda paraphrasing what a person has said and that which he actually said and meant. Being in direct conflict with the testimony of Freeman and his wife, these records could not have conclusive force over their testimony.

■ It is our conclusion that the evidence presented a proper issue for the jury.

■ This phase of the case bears one further mention for the sake of future guidance. The instructions to the jury were given in the literal terms of the policy, without elaboration, presenting the issue of liability on the basis of whether the 1963 accident resulted "directly and independently from all other causes in loss covered by the defendant company's insurance policy," etc. Under our previous decisions on the subject it is proper to instruct in the words of the contract. Sometimes, however, as in this instance, figuring out exactly what the language of an insurance policy says would leave a Philadelphia lawyer with a severe case of astigmatism. We think, therefore, it would be advisable in such instances to give the jury a little help by way of simpler language, along suggested lines as follows:

"If you believe from the evidence that the disability for which the plaintiff seeks recovery resulted from the injury he sustained on July 31, 1963, directly and independently of all other causes, you will find in his favor; but unless you so believe you will find for the defendant."

"The words 'other causes' as used in this instruction include pre-existing infirmity or disease only if it substantially contributed to the disability in question."

■■ Freeman cross-appeals from that portion of the judgment determining that interest shall commence as of January 30, 1968, the date on which his counsel demanded payment before filing suit. We are not at all persuaded by the company's argument that his claim for interest prior to that time is barred by laches. It is our opinion that he is entitled to interest on each monthly payment as it fell due after he had filed his proof of loss under which the company rejected the claim. The necessity of any further or supplemental proofs of loss was waived by the company's denial of liability. Cf. Couey v. National Benefit Life Insurance Co., 77 N.M. 512, 424 P.2d 793, 797–798 (1967).

The judgment is affirmed on the appeal and reversed on the cross-appeal with directions that interest be adjudged in accordance with this opinion.

All concur.