670 P.2d 1305

**Ron JONES, Plaintiff-Respondent, Cross-Appellant,**

v.

**MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, aka Mountain Bell, a foreign corporation, Defendant-Appellant, Cross-Respondent.**

No. 13721.

Court of Appeals of Idaho.

Oct. 4, 1983.

Rehearing Denied Oct. 4, 1983.

Petition for Review Denied
Jan. 18, 1984.

---

B. Newal Squyres, Jr., and Richard A. Riley of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for defendant-appellant, cross-respondent.

Jay D. Sudweeks of May, May, Sudweeks, Shindurling & Stubbs, Twin Falls, for plaintiff-respondent, cross-appellant.

## ON DENIAL OF PETITION FOR REHEARING

SWANSTROM, Judge.

Ronald Jones is a disabled former employee of Mountain Bell. He sued the Company, contending that under the Company's employee benefit plan he was entitled to "accident disability benefits" as opposed to the "disability pension" which the Company actually awarded him. The trial court agreed and entered judgment against the Company for the unpaid benefits. The Company appealed from the judgment. Jones cross-appealed from the order denying his request for attorney fees. We affirm the trial court's judgment, but vacate the order concerning attorney fees and remand for further consideration of the attorney fee question.

The basic legal issue in this case stems from the parties' conflicting interpretations of the employee benefit plan. The Company, relying on a literal reading of the plan's text, asserts that for an employee to be eligible for accident disability benefits, the employee's disabling injury must have resulted "solely" from an accident during and in direct connection with the performance of the employee's duties. The trial judge, however, arrived at a different interpretation. He noted that the booklet containing the full text of the plan also contained a brief description of the plan which seemed to contradict the more restrictive language of the official text. The brief description stated that an employee could receive accident disability benefits if he became disabled "because of" an on-the-job accident. The court construed this "ambiguity" against the Company. The judge decided that an employee is entitled to receive accident disability benefits where his medical problems are *proximately caused* by an on-the-job accident. The court thus substituted "proximate cause" for "sole cause" as the governing language of the contract. The Company contends that the trial court erred by altering the terms of the contract.

The second major issue is whether the trial court erred by finding that the Company acted arbitrarily and capriciously and by concluding that Jones was entitled to the benefits he sought. The plan contains a provision that it shall be exclusively administered by an "Employees' Benefit Committee" appointed by the Company's Board of Directors. The Company asserts that the action of the committee in denying Jones accident disability benefits should be upheld because the committee did not act arbitrarily and capriciously. The Company argues that the record establishes, as a matter of law, an adequate factual basis for the committee's decision and therefore the trial court's judgment should be reversed.

Before analyzing these two issues, we will summarize the facts disclosed by a lengthy record. Jones started work for the Company in 1949 and was retired because of poor physical condition in March, 1975. During his employment Jones endured nu-

merous episodes of injury, illness and medical treatment. In 1953, 1956 and 1957 Jones fell from poles while working, but apparently did not sustain serious or permanent injuries. After 1959 his health began to deteriorate. In 1963 he experienced a "foot drop" problem with his left foot. This problem spontaneously corrected itself, but led to discovery that Jones had "an early arthritic reaction" of the spine in the lower back. He received sickness benefits under the company plan when he was forced to be absent from work.

The most scrutinized episode among Jones' misfortunes concerns his fall from a telephone pole in February, 1964. His "climbers" slipped and he fell between fifteen and twenty feet to the ground. There is no question but that Jones suffered a painful injury to his right knee in this accident when he struck a solid object with his knee before landing on his feet. Jones was hospitalized for five days after the fall for treatment of a gastric internal hemorrhage which developed several hours after the accident. Dr. Vaughn Pond, Jones' doctor, also observed that Jones' right knee was tender and effusive and noted that Jones complained of pain in his right knee, right flank and the lumbosacral area.

After his fall on February 4, Jones, complaining of a sore right knee, remained off work until the latter part of April. Dr. Pond performed an aspiration of fluid from Jones' swollen knee on February 13th and again on February 18th. On March 2, 1964, Dr. William Tregoning reported to the Company in Boise that he had examined Jones, who had been complaining of pain and discomfort in his right knee. Dr. Tregoning diagnosed Jones' condition as chondromalacia, i.e., softening of the cartilage, involving the articular surface of the kneecap.

In April, 1964, two of Jones' supervisors talked to him about excessive absenteeism—over 500 days during the previous five years—and warned that this could not continue. They offered Jones a cash settlement in return for his resignation and a waiver of all future benefit claims. Jones refused. He was offered a different job that did not involve pole climbing, but which paid less. Jones objected to the pay cut but was ordered to report to work in five days for the new job. Jones went back to work.

Almost immediately after Jones' accident in February, the Company began to categorize Jones' knee problems as symptoms of a disease or chronic illness rather than as the product of an accidental injury. In March, 1964, a supervisor directed the Company's payroll office in Salt Lake City to reclassify the monies paid to Jones during his absence as illness pay rather than accident benefits. Dr. Q.W. Mack, the Company's medical director in Boise, determined that Jones' knee condition did not arise from his fall but was symptomatic of a chronic knee disease. Dr. Mack's determination was based on the opinion of Dr. George Warner, a company consultant. Dr. Warner examined Jones on March 30, 1964. He reported to Dr. Mack on July 3, 1964, that he had examined Jones again on June 29, 1964. He stated that although Jones complained of constant aching in his right knee, and also of occasional, more severe pain, he could not account for Jones' disability on the basis of physical findings. In a letter to Jones' supervisor, Dr. Warner expressed his belief that Jones had a tendency to magnify his symptoms.

The Company's disenchantment with Jones was further aggravated by an incident which occurred on July 15, 1964, when Jones fell and struck his right knee after his knee "buckled" when he was climbing down a ladder. Reporting to a company supervisory foreman, Dr. Warner stated that Jones suffered a small bruise from the accident and that in his opinion the injury did not warrant further lost time. By late 1964, Jones' supervisors, in memoranda to each other concerning Jones' absences, were derisively referring to him as "our friend."

On December 7, 1964, the Idaho benefit committee, consisting of company managerial personnel from Idaho, approved payment of partial disability benefits to Jones to compensate him for his reduction in pay due to his reclassification from repairman

to frameman. Jones contends that by grounding him after his February 4th fall the Company had implicitly recognized that the accident had left him disabled. The Company, on the other hand, maintains that it grounded Jones solely because of his general health, his accident proneness, and the Company's need for greater supervision over him. When the employee benefit committee met in Denver on January 4, 1965, it rejected the recommendation of the Idaho committee and concluded unanimously that the injuries Jones sustained on February 4, 1964, were not accidental injuries within the meaning of section 5.5 of the plan. The committee determined that no partial disability benefits were therefore payable. The committee evidently agreed with Dr. Mack's conclusion that Jones' recurrent knee problems were the product of disease rather than of his fall on February 4.

During the eleven-year period between the date of Jones' accidental fall and his retirement, he made regular complaints to the Company concerning pain in his right knee and lower back. During this same period he was examined and treated by several doctors, some employed by the Company and some employed by Jones.

In August, 1965, Dr. Pond operated on Jones' right knee, removing "multiple loose bodies." In June, 1966, Dr. Pond removed the knee cap. He later testified at trial that the accidental fall from the pole on February 4, 1964, was the cause of Jones' knee problems. After each of these operations Jones remained off work for several months.

Beginning in 1968, Jones' back problems began to overshadow his knee as his major health problem. Two doctors reported the results of their examinations to the Company. In December, 1968, Dr. Powell operated on Jones' spine for a herniated disk that he attributed to the February, 1964 fall. In Dr. Powell's opinion, a compressed nerve in the back could have caused pain and discomfort to the right knee. Other doctors, including a panel of four physicians, examined Jones. The panel reported to the Company that Jones suffered from a permanent partial impairment of 33⅓% compared with the loss of a leg at the hip. The examining doctors gave varying opinions as to the cause and extent of Jones' back condition.

Jones continued to experience pain radiating from his back to his right knee. He sought additional treatment from Dr. Powell at company expense. Based on another doctor's opinion that further surgery was not indicated, the Company balked but later relented. In August, 1969, Dr. Powell again operated on Jones' spine, found the nerve still compressed, and performed a second laminectomy. At this time, Dr. Pond also gave his firm opinion to the Company that Jones' disk injury was caused by the accidental fall of February, 1964. A company doctor recommended that Jones be given a desk job. However, Jones continued to miss work over the next several years because of back and leg pain. More back surgery was performed by Dr. Powell in June, 1974. Jones never returned to work after this surgery.

In February, 1975, the Company's doctor recommended that Jones be medically retired. In March the Company concurred and granted Jones a "disability pension." Jones requested the Company reconsider and grant him *accident* disability benefits which were greater. The Company advised Jones that it "was completely familiar with all aspects of the case" and then denied Jones' request. Jones filed this suit within the year to collect "accident disability benefits" from the Company.

From a mass of evidence taken at trial, consisting of company records and documents, medical reports, and the like, the court found that

> Jones' accidental fall on 2–4–64 was a proximate cause of injury to his back in the area of L4–5 causing compression of nerve root (a pinched nerve) which produced pain in and around Jones' right knee and which eventually led to the June '69 finding that he suffered a permanent partial impairment of 33⅓% as compared with loss of leg at the hip and his eventual retirement on March 17, 1975.

The court held that the Company "acted arbitrarily and capriciously when on March 17, 1975, it granted Jones a disability pension rather than accident disability benefits to which he was clearly entitled on that date." Consequently, the court determined that it was not bound by the "conclusive" determination of the committee regarding Jones' entitlement to benefits. The trial court ruled that, in such circumstances, it could substitute its own findings for those of the committee.

I

The first issue we examine is whether the trial court erroneously concluded Jones was entitled to accident disability benefits. The court held that since Jones' disabling injuries were "proximately caused" by an on-the-job accident, the fact that a pre-existing disease may have contributed to his injuries was irrelevant. In reaching this decision, the court concluded that a summary of the accident benefit plan, which was printed in the same booklet as and just before the official text, was itself a part of the plan.

> Section 5.5 of the official text reads: Accident injuries shall be considered as arising out of and in the course of employment only where the injury has resulted *solely* from an accident during and in direct connection with the performance of duties to which the employee is assigned in the service of the Company .... [Emphasis added.]

On the other hand, the summary states:

> Accident Disability Benefits are designed to help replace your regular earnings when you are disabled *because of* an on-the-job accident. These benefits can continue as long as you remain totally disabled. In addition, the Company will pay the cost of any reasonable and necessary medical expenses you may have incurred because of the accident. [Emphasis original.]

The court held that the summary enunciates a standard of proximate cause, while the official text sets out a "sole cause" standard. Construing this ambiguity

against "the party who provided that language," i.e. the Company, the court decided to apply the "proximate cause" standard.

The Company urges first that the summary is not a part of the official text. Second, it claims that if this is true there is no ambiguity because the language of section 5.5 is clear. Finally, it argues that if the language of the plan is unambiguous, its meaning is to be determined *only* from the language of the plan itself. We agree.

██ The summary of the plan should not have been considered by the trial court. When a summary expressly states that the official text controls the operation of the plan, the summary has no legal effect. *See Van Orman v. American Ins. Co.,* 680 F.2d 301 (3d Cir.1982); *Spitznass v. First National Bank of Oregon,* 269 Or. 676, 525 P.2d 1318 (1974). In the present case, the summary states in its last paragraph: "This section of the booklet describes only the highlights of the Plan. It does not attempt to cover all details. These are contained in the official Plan Text and Trust Agreements which legally govern the operation of the Plan." We believe that this language gives adequate notice to the employees that their rights are controlled only by the official text.

██ We further agree that the language of section 5.5 is clear and unambiguous. Nothing in the remainder of the official text contradicts or confuses the requirement that an accident must be the *sole* cause of the injuries in order for those injuries to be covered by the plan. It is also true that when the language of a contract is unambiguous its meaning must be determined from its language alone, without resort to extrinsic evidence. *Juker v. American Livestock Ins. Co.,* 102 Idaho 644, 637 P.2d 792 (1981). Nonetheless, for reasons we will state, we believe that section 5.5 should be construed only to require that an accident be the *dominant* cause of the injury. We reach this conclusion not by a construction of ambiguous language, since we have held that the language is unambiguous, but by the recognition that "sole cause" has a specialized legal meaning, beyond its

plain English meaning, in the application of insurance law. *Cf. Nielsen v. Provident Life & Accident Ins. Co.,* 100 Idaho 223, 596 P.2d 95 (1979).

In the spirit of liberal construction of insurance contracts, *Stoddard v. "AID" Ins. Co. (Mutual),* 97 Idaho 508, 547 P.2d 1113 (1976), the "more modern" rule regarding restrictive language in accident insurance policies defines the "sole cause" standard to mean no more than that an accident must be the prime or moving cause of the death or injury. APPLEMAN, INSURANCE LAW & PRACTICE § 393 (1981). Our own Supreme Court has used the phrase "dominant cause." *Erikson v. Nationwide Mutual Ins. Co.,* 97 Idaho 288, 292, 543 P.2d 841, 845 (1975). *See also Goodwin v. Nationwide Ins. Co.,* 104 Idaho 74, 656 P.2d 135 (Ct.App.1982). This rule holds no matter how stringent the language of the policy. APPLEMAN, *supra.* Thus, where an insurance policy requires that an accident be the *sole* cause of death or injury, a loss is still covered, even though a pre-existing disease may have contributed to the loss, if the accident is the *dominant* cause.

The Kentucky Court of Appeals in *Continental Casualty Company v. Freeman,* 481 S.W.2d 309 (Ky.Ct.App.1972) succinctly laid out the rationale for this rule:

> Contractual language limiting the insurer's risk to those losses which result from injuries (or sickness) independently of all other causes commonly appears, with variations, in accident and health policies and in the double indemnity feature of life policies.
>
> In an absolute sense no single event can ever be the "exclusive" cause of a disability, and for that reason there must be some rule or principle by which a separation can be made between those causative factors that are legally inconsequential and those that must be recognized in determining whether under this condition of coverage a specific illness or injury is the sole and independent cause of the disability or death.

*Id.* at 312. In other words, if the language in the policy is given its literal meaning, the

policy would be nearly meaningless. Although it purports to cover accidental injuries, its language would exclude virtually every loss because an injury rarely could be said to result by accident, independently of *all* other causes.

The Kentucky court has made clear therefore that certain causes are deemed legally consequential, some inconsequential. When an accident insurance policy limits its coverage to injuries resulting from certain causes *independently of all other causes,* the law defines "cause" as "legally consequential cause." In turn, "legally consequential cause" means the prime or moving or dominant cause. As a matter of practicality, in order to give meaning to many accident insurance policies, certain contributing factors are not allowed to defeat coverage unless they are consequential.

This rule was aptly demonstrated by Chief Judge Cardozo in *Silverstein v. Metropolitan Life Ins. Co.,* 254 N.Y. 81, 171 N.E. 914 (1930). Regarding insurance for bodily injuries "caused directly and independently of all other causes by accidental means," he said:

> In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men. [Citation omitted.] "Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract." [Citations omitted.] A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules.

*Id.* 171 N.E. at 915. Cardozo drew a distinction between a "dormant" infirmity, which is not a legally consequential cause, and a "morbid or abnormal condition," which is. The former will not preclude recovery, while the latter falls within the

restrictive clause and prevents recognition of the loss. In other words, the law disregards an infirmity which would not have precipitated the injury, in the absence of the accident, as a "cause" under an accident insurance policy. "An ulcer as trivial and benign as an uninfected pimple is at most a tendency to an infirmity, and not an infirmity in itself." *Id.*

*Silverstein* does not stand alone. In *Neeman v. John Hancock Mutual Life Ins. Co.,* 182 Neb. 144, 153 N.W.2d 448 (1967), the Nebraska Supreme Court dealt with a life insurance policy which agreed to pay additional benefits when "death was caused directly, independently and exclusively of all other causes, by a bodily injury sustained solely by external, violent, and accidental means . . . . EXCEPTIONS AND EXCLUSIONS: . . . . Nor shall such Additional Benefit be payable if death results, directly or indirectly, or wholly or partially, (1) from any bodily . . . disease or infirmity . . . ." The court held that the strict language of the policy was "not the test of causality. For garden-variety clauses the beneficiary may recover upon proof of an accident that was an active, efficient, and precipitating cause of death." *Id.* 153 N.W.2d at 451. *See also Pan American Life Ins. Co. v. Youngblood,* 569 S.W.2d 951 (Tex.Civ.App. 1978).

In *Egan v. Travelers Ins. Co.,* 224 Wis. 596, 273 N.W. 68 (1937), the Wisconsin Supreme Court held that the clause "independently of all other causes" meant that the accident must have been the "sole proximate cause" of the injury. The test of "sole cause" was said to be:

> * * * if a disease or bodily condition exists and an accident occurs, . . . it is not necessary that the injury or the results thereof would have been as severe as they were had the disease or bodily condition not existed; but it is sufficient if the accidental means would have solely caused some considerable injury had the disease or bodily condition not existed. But, if no considerable injury at all would have resulted had the insured not been afflicted with the existing disease or con-

dition, the accidental means cannot be considered as the sole cause of the injury. *Id.* 273 N.W. at 70, quoting from *Herthel v. Time Ins. Co.,* 221 Wis. 208, 265 N.W. 575, 577 (1936). Other cases which reach the same result are too numerous to discuss here, but we call attention to the following sources: APPLEMAN, *supra,* § 393; Annot., 84 A.L.R.2d 176; 43 Am.Jur.2d, INSURANCE, § 609 (1982); *Erikson v. Nationwide Mutual Ins. Co.,* 97 Idaho 288, 292, n. 2., 543 P.2d 841, 845, n. 2 (1975).

Our own Supreme Court has not been silent on this question. In *Erikson, supra,* the Idaho Supreme Court considered a problem similar to that now facing this court. In that case, Erikson was riding a snowmobile when he was struck in the right eye by a pine bough. The blow caused his eye to bleed and become cloudy, and after a few months the eye progressively deteriorated to the point of complete blindness. Several ophthalmologists testified concerning the cause of Erikson's blindness. All agreed that he had a central retinal vein occlusion, rendering him permanently blind. The experts also agreed that he had symptoms of sclerosis and hardening of the veins and arteries of the eye. They, however, differed in opinion as to whether the accident or the sclerosis was the cause of Erikson's blindness.

Nationwide had issued Erikson an accident insurance policy providing benefits to Erikson only if he could present satisfactory proof that the injury was sustained "as a direct result of an accident . . . directly and independently of all other causes." Nationwide claimed on appeal that the trial court had erred by refusing to give a jury instruction that the accident must have been the "sole cause or the cause independent of all other causes" in order for the jury to find liability within the requirements of the insurance policy. *Erikson v. Nationwide Mutual Ins. Co.,* 97 Idaho at 291, 543 P.2d at 844. The trial court instead gave an instruction that the plaintiff could recover if the accident was shown to be the "dominant cause" of his blindness, even though other

facts may have existed tending to cause the loss of vision.

The Idaho Supreme Court held that the jury was properly instructed. The court observed that it could not sanction a strict technical interpretation of the policy language which would defeat the very purpose of the insurance coverage. The court then stated:

> we believe that the mere fact that a latent disease or bodily infirmity exists prior to accident, upon which the accident acts to precipitate the loss, will not defeat coverage so long as the disease or infirmity appears as a passive ally and the accidental cause predominates .... Seldom does a loss involve a *sole* [emphasis original] cause independent of all other causes as asserted by the appellant. Furthermore, we recognize that there is a plethora of authority in other jurisdictions holding that language in insurance contracts restricting coverage as does the policy here, nevertheless has *no greater meaning than the requirement that an accident must be the dominant cause of the injury* incurred or the active efficient cause that precipitated the resulting loss. [Emphasis added.]

97 Idaho at 292, 543 P.2d at 845.

The Company argues that because our Supreme Court in *Casey v. Highlands Ins. Co.,* 100 Idaho 505, 600 P.2d 1387 (1979), rejected the insurance doctrine of reasonable expectations, the principle of construction adopted by the court in *Erikson* is no longer valid. However, the *Erikson* decision was not based upon the doctrine of reasonable expectations. The court in *Casey* did not reject or overrule its holding in *Erikson. Casey* instead overturned *Corgatelli v. Globe Life & Accident Ins. Co.,* 96 Idaho 616, 533 P.2d 737 (1975), in which a divided court had adopted the doctrine of reasonable expectations, and embraced instead the dissenting view of Justice Donaldson, joined by Justice McFadden, from that case. Both Justice McFadden and Justice Donaldson joined a unanimous court in *Erikson,* which was decided after *Corgatelli.* It can be assumed that if *Erikson* had been

based on the reasonable expectation doctrine, those Justices would likewise have dissented there. Thus, we cannot conclude that *Casey* implicitly overturned *Erikson.*

■ Therefore, we hold that Jones was required to show only that the accident was the dominant cause of his injuries. Any congenital infirmity he may have had is irrelevant as long as it was a passive ally of the accident which resulted in his injuries. The trial judge reached the same result but used somewhat different language. In a conclusion of law the judge said that the standard he applied was "whether the accident was a *proximate* cause of Jones' injury or disability." [Emphasis added.] However, a full reading of the findings of fact and conclusions of law demonstrates that the judge, in essence, determined the 1964 accident to be the dominant or active efficient cause of Jones' disability. In *Erikson v. Nationwide Mutual Ins. Co., supra,* the Idaho Supreme Court said:

> Defendant's instruction was refused and in lieu thereof the court instructed that in order to be the *proximate cause* of the injury it must be shown that the accident is the "dominant cause" although other factors may have existed which also tended to help produce a loss of sight. [Emphasis added.]

*Id.* 97 Idaho at 291, 543 P.2d at 844. *Erikson* therefore requires that an accident be the proximate cause of the injuries. In addition, to be the proximate cause, the accident must have been the dominant cause of the injuries. Hence, dominant cause defines and limits proximate cause. Although the trial judge used the phrase "proximate cause," it is clear he applied the standard of *Erikson.*

■ The Company argues that principles derived from insurance law should not be applied to its employee benefit plan. Insurance contracts are contracts of adhesion because the insured has no opportunity to negotiate and bargain for favorable terms. Thus, insurance contracts are strongly construed against insurers and in favor of the insured. This principle, the Company urges, has no application to the

accident disability benefit plan, which was the subject of collective bargaining between the Company and Jones' union, the Communication Workers of America. We do not doubt that the union had more bargaining power in dealing with the Company than does the average insured in dealing with an insurance company. We believe, however, that the purposes of accident insurance policies and of the disability provisions of employee benefit plans are sufficiently similar to warrant the application of the same rules of construction in both cases.

As a general rule an employee pension plan is, like an insurance policy, to be liberally construed in favor of the employee and, if formulated by the employer, should be construed strongly against the employer. *Smith v. Union Carbide Corp.,* 231 F.Supp. 980 (E.D.Tenn., N.D.1964); *Frietzsche v. First Western Bank & Trust Co.,* 168 Cal.App.2d 705, 336 P.2d 589 (1959); *Levitt v. Billy Penn Corp.,* 219 Pa.Super. 499, 283 A.2d 873 (Pa.1971). Moreover, as our Supreme Court has recognized, disability benefits under a noncontributory, employer-financed pension plan are not a gratuity, but constitute delayed compensation for services rendered. The benefit to the employee is part of the consideration for his services. *Guy v. Guy,* 98 Idaho 205, 560 P.2d 876 (1977). In essence, it is as though the employee were taking part of his pay and purchasing an annuity contract or insurance policy to protect himself from the foreseeable hazards of his occupation. In this sense, an employee disability plan is like a disability insurance policy.

It is quite common for accident policies to insure against disability which prevents the insured from following his usual occupation. However, under the usual policy provision the insurance against this type of disability is for a limited period, generally 52 weeks, and thereafter by the terms of the policy in order for the insured to be entitled to further benefits he must be unable by reason of his disability to follow any occupation for gain or profit and not merely his own occupation.

VANCE, HANDBOOK ON THE LAW OF INSURANCE § 205 (3d ed. 1951). We believe that application of insurance law to an accident disability benefit plan is proper in this case.

We therefore hold that an employee is entitled to recover accident disability benefits under the Mountain Bell plan if an on-the-job accident is shown to be the dominant or active efficient cause of his disability. We conclude that the court did not err in rejecting a strict, literal reading of the "sole" cause standard urged by the Company under section 5.5 of the plan.

### II

We now turn to the second issue raised by the Company—whether the trial judge erred in substituting his determination for that of the employee benefit committee. The judge acted upon a finding that the Company had acted arbitrarily and capriciously in denying Jones' claim.

Section 3.3 of the plan provides that a five-member employee benefit committee, appointed by the Company's board of directors, "shall determine conclusively for all parties all questions arising in the administration of the Plan." Where a pension plan contains such a provision, "routine decisions about plan administration, including determination of eligibility, are conclusive if made in good faith and if not arbitrary, capricious, or discriminatory." *Paterson v. Southwestern Bell Telephone Co.,* 411 F.Supp. 79, 86 (E.D.Okl.1976). *See also Marsh v. Greyhound Lines, Inc.,* 488 F.2d 278 (5th Cir.1974); *Moore v. Adkins,* 2 Kan. App.2d 139, 576 P.2d 245 (1978); *Smith v. New England Tel. & Tel. Co.,* 109 N.H. 172, 246 A.2d 697 (1968); *Chavez v. Sandia Corp.,* 89 N.M. 578, 555 P.2d 699, (1976); *McHorse v. Portland Gen. Electric Co.,* 268 Or. 323, 521 P.2d 315, (1974); *Long v. Southwestern Bell Tel. Co.,* 442 S.W.2d 462 (Tex.Civ.App.1969).

In reviewing decisions of employee benefit committees, the courts may consider such things as:

whether the employer acted capriciously because the decision was not based on

substantial reasons; whether the claimant raises a genuine factual issue under the terms of the plan which indicates arbitrariness or bad faith; [or] whether there was bad faith, bias, or prejudice . . . .

*McHorse v. Portland Gen. Electric Co.,* 521 P.2d at 319. Bad faith may be established not only by direct evidence "such as evidence of unreasonable requirements, refusal to consider favorable information, or the use of standards more strict than those applied to others similarly situated," but also may be "inferred from an adverse decision which has no basis in fact." *Marsh v. Greyhound Lines, Inc.,* 488 F.2d at 280.

■ The Company in this case argues that Jones did not prove the committee acted arbitrarily and capriciously in deciding that Jones' disability was not caused *solely* by his fall from the telephone pole in 1964. The Company points out, correctly, that even Jones' own doctors, Dr. Pond and Dr. Powell, testified at trial that they did not believe Jones' back problems were caused solely by this fall in 1964. The Company contends that, because the testimony of the doctors at trial—together with other evidence—showed that other factors besides the fall from the pole in 1964 may have contributed to Jones' disability, then as a matter of law there was an adequate factual basis for the committee's decision denying accident disability benefits under the plan. However, we have determined that the standard is not whether an accident is the sole cause of the injuries. The committee's decision was based on an incorrect standard, and does not therefore necessarily have an adequate factual basis under the correct standard.

Neither party in this appeal has specifically addressed the question of the proper judicial remedy where an employee benefit committee's determination is overruled because the legal standard employed by the committee is held to be wrong. It appears that a district court has two alternatives. The court may either do what was done here—substitute its own findings under the proper legal standard for the decision of the committee—or it may set aside the committee's determination and order the committee to reconsider the employee's claim under the correct standard. The first alternative avoids the possibility of two judicial proceedings—one to test the legal standard employed by the committee, and another to test the committee's ultimate decision. The second alternative preserves, to a greater extent, the authority given to the committee by agreement of the Company and its employees to "determine . . . all questions arising in the administration of the Plan."

■ In our view the second alternative is to be preferred, *unless* it appears from the record that the committee exhibited bad faith in utilizing a legal standard it knew or should have known was wrong, or that the committee's decision was tainted by prejudice, or that the committee otherwise acted arbitrarily and capriciously toward the employee. *See McHorse v. Portland Gen. Electric Co., supra.* In the present case there has been no showing that the committee chose the "sole" cause standard in bad faith. However, we are concerned about other indicia of prejudice and arbitrariness toward Jones.

It should be noted first that the committee in this case does not appear from the record before us to be a wholly independent hearing body. It is part of the Company's management team, administering the operation of the plan. As such, the structure of the committee provides no real separation from the Company's medical director and supervisory personnel in the adversary process of deciding an employee's disputed claim of disability. If an independent review discloses that the committee's decision was influenced by prejudicial or arbitrary conduct on the part of company personnel, then we believe the reviewing court is justified in not returning the matter to the committee for further consideration, but may make its own findings and determination of the rights of the parties under the plan. *See McHorse v. Portland Gen. Electric, supra; Smith v. New England Tel. & Tel. Co., supra.*

■ The trial judge made pertinent findings on this question. He found that the Company had acted arbitrarily and had demonstrated prejudice against Jones. When findings of fact by a trial court are challenged, the appellant has the burden of showing error, and the appellate court will review the evidence in a light most favorable to the respondent. *Higginson v. Westergard,* 100 Idaho 687, 604 P.2d 51 (1979). A summary of the evidence on this point, viewed in a light most favorable to Jones, is set forth below.

Jones' immediate supervisors regarded him with scorn, if not outright malice. Numerous memoranda circulated among them referring to Jones derisively as "your friend" or "your old buddy" and expressed the desire of Jones' superiors to get rid of him. Plans were formulated in an effort to get Jones to resign or accept a minimal payment in return for a waiver of all his rights. This is one indication of prejudice against Jones by some of the Company's management.

Almost immediately after the February, 1964 accident, the Company made a deliberate decision to reclassify the time Jones was absent from work as time lost due to illness rather than accident. This was done in spite of reports furnished by Jones, his foreman and his treating physician, all clearly showing that Jones had suffered injuries as a result of the accident. The Company adjusted its records and paid Jones accordingly. This initial decision to classify Jones' lost time as illness rather than as accident time could not have been based entirely upon an objective evaluation of the facts. Jones' fall was serious enough to require five days' hospitalization for treatment of a severe internal hemorrhage. Jones also complained of knee pain while at the hospital and saw Dr. Pond to have his knee aspirated twice within the first two weeks following the accident. The record indicates that Jones had last fallen from a pole in 1957, and between that year and 1964 he had experienced no problems with his knee.

It can be inferred from the record that this refusal to classify Jones' fall as a disabling accident was based not upon the facts, but upon a desire to save money and to avoid— as one company memorandum put it—the "horror" of having to pay accident benefits at some time in the future.

Once the Company decided to regard Jones' case as an illness rather than an accident, it held fast to that position despite dissension from some of its own management personnel. The course set by the Company was contrary to its plant manager's report in December, 1964, that "the fall from the pole in February did in effect result in injury." The Company's position also effected a reversal of the local [Idaho] benefit committee which in December, 1964, had determined Jones was entitled to accidental disability benefits as a result of the fall.

The record discloses an abundance of medical evidence that Jones' knee and back problems were directly linked to his fall in 1964. Both physicians who treated Jones believed that the primary cause of Jones' knee and back problems was that fall, and both expressed their opinions in letters that reached the committee.

■ We conclude that there was substantial evidence to support the trial court's finding that the Company acted arbitrarily and capriciously and displayed prejudice against Jones. This, coupled with the fact that the committee relied on the Company's arbitrary and prejudicial reports and the fact that the committee was appointed by the Company's board of directors, brings us to the conclusion that the committee's action in denying accident disability benefits was irreparably tainted by prejudice. Therefore, the judge did not err by substituting his own findings as to the cause of Jones' disability. Those causation findings are also supported by substantial, competent evidence. We will not disturb the trial court's decision.

### III

■ In his cross-appeal, Jones contends that the trial court erred in disallowing his

claim for attorney fees under I.C. § 12–121. The trial judge held that he could not exercise his discretion to award attorney fees under I.C. § 12–121. He believed his discretion was restricted by I.R.C.P. 54(e)(1). This rule provides that attorney fees can be awarded only upon a showing that the action was "brought, pursued or defended frivolously, unreasonably or without foundation." Because the trial court did not believe that the Company had defended the action unreasonably and without foundation, it denied Jones' claim for attorney fees.

We do not necessarily disagree with the judge's conclusion. However, the judge was mistaken in believing he was bound to apply the criteria of rule 54(e)(1). As we noted in the recent cases of *Barnes v. Hinton,* 103 Idaho 619, 651 P.2d 553 (Ct.App. 1982) and *T-Craft Aero Club, Inc. v. Blough,* 102 Idaho 833, 642 P.2d 70 (Ct.App. 1982), rule 54(e)(1) applies only to actions filed after March 1, 1979. This action was filed in September, 1975. Therefore, the trial judge incorrectly determined that he was bound by rule 54(e)(1). In view of the trial judge's erroneous assumption, we hold that he denied attorney fees on improper grounds. The judge's order is vacated and the case is remanded for the trial court to decide, in the proper exercise of its discretion, whether to award attorney fees. As we noted in *Barnes,* the trial court is at liberty in this case to follow, or not to follow, rule 54(e)(1) as a guide to the exercise of its discretion.

Costs to respondent. No attorney fees awarded on appeal.

WALTERS, C.J., and BURNETT, J., concur.